## Potter v. Dark Tobacco Growers Co-Operative Association.

(Decided December 21, 1923.)

### Appeal from McCracken Circuit Court.

1. Constitutional Law—Statute Upheld if Validity Doubtful.—If there is doubt as to the validity of a statute, it will be upheld.

2. Monopolies—Contract with Co-operative Marketing Association Held Not Violation of Anti-Trust Provisions.—A contract between tobacco grower and co-operative marketing association organized pursuant to the Bingham Co-operative Marketing Act, whereby he agreed to deliver his crops to it for four years, held not violative of the anti-trust provisions of either the Sherman Act (U. S. Comp. St. sections 8820, 8823, 8827, 8830) or the common law, especially in view of the Clayton Amendment (U. S. Comp. St. section 8835f), treating farmers as a distinct class.

3. Constitutional Law—Co-operative Marketing Act Not Offensive to Equal Protection Provisions.—The Bingham Co-operative Marketing Act, authorizing producers of agricultural products to form co-operative marketing associations, is not offensive to the equal protection provisions of the Fourteenth Amendment to the federal Constitution.

4. Constitutional Law—Construed with Reference to Economic Conditions and Public Policy.—All law, even constitutional law, is not static, but progressive, and to be construed with reference to sound economic conditions, and an enlightened public policy.

5. Contracts—Agreement Between Member and Marketing Association Held Not Lacking in Mutuality.—An agreement whereby a tobacco grower agreed to deliver his crops for four years to a co-operative marketing association organized under Acts 1922, c. 1, or pay liquidated damages, in consideration of agreement of the association to receive, handle, and market the tobacco, and in consideration of like agreements of other members, was not lacking in mutuality.

6. Injunction—Breach of Contract to Deliver Tobacco to Marketing Association Enjoined.—A co-operative marketing association or-

ganized under Acts 1922, c. 1, was entitled to enjoin violation of contract by member to deliver his crops of tobacco for four years to the association, especially as both the statute and contract provided for injunctive relief to prevent a breach.

7. Damages—Liquidated Damages Specified for Breach of Contract to Deliver Crops Not Penalty.—Provision in contract with co-operative marketing association organized pursuant to Acts 1922, c. 1, that member should pay the association 5 cents per pound as liquidated damages for all tobacco sold to others, is not unjust or oppressive, and must be construed as liquidated damages rather than a penalty.

8. Injunction—Legislature has Power to Authorize Injunction for Breach of Contract.—The Legislature has the power to prescribe appropriate remedies to prevent or redress civil wrongs, and it did not in the Bingham Co-operative Marketing Act transcend such power by providing that a co-operative association could resort to injunctive relief to prevent breach of contract by member to deliver his crops to the association.

ANDREW M. NICHOLS for appellant.

AARON SAPIRO, ROBERT W. BINGHAM, ABE D. WALDAUER, and BRADSHAW & MacDONALD for appellee.

OPINION OF THE COURT BY JUDGE CLARKE—Affirming.

Appellee was organized and incorporated under and pursuant to the provisions of chapter one of the 1922 Acts of the Kentucky General Assembly, which is known as the "Bingham Co-operative Marketing Act." Appellant became a member of the association, and by written contract agreed to deliver to it his crops of tobacco for the years 1922 to 1926, inclusive, as did 75 per cent. of the growers of dark tobacco in Kentucky, Indiana, and Tennessee.

Questioning the validity of the act and his contract, he was threatening and about to deliver his 1923 crop of tobacco elsewhere when this action was instituted against him by appellee under our Declaratory Judgment Law (chap. 83 of the 1922 Acts) for decision of seven legal questions arising out of the contract and in dispute between the parties. There was no issue of fact, and the judgment being adverse to him on each question, he has appealed.

For a statement of the questions involved, we quote the judgment:

"1. That the Bingham Co-operative Marketing Act, being chapter 1 of the Acts of the Legislature of

Kentucky of 1922, page 1, is not in conflict with or violative of section 1, article 14 of the Constitution of the United States, and that said Bingham Co-operative Marketing Act is not improper class legislation within the meaning of the Fourteenth Amendment to the Constitution of the United States.

"2. That the contract between plaintiff and defendant, fully set out in the petition, is not violative of the statute of frauds of this Commonwealth, that is, paragraph 7 of section 470 of Carroll's Kentucky Statutes.

"3. That said contract between the parties does not create or tend to create or develop a monopoly or combination in restraint of trade in any way, or is it in violation of the Sherman Anti-Trust Act, passed by the Congress of the United States, being the act of July 2, 1890, and subsequent acts of Congress amendatory thereof, or in violation of the act of Congress of the United States, enacted August 27th, 1894, or any subsequent act or acts amendatory thereof.

"4. That there is mutuality in said contract, and that it is not defective or invalid or unenforceable because of want of mutuality.

"5. That the plaintiff is entitled to equitable relief, and is entitled to an injunction to prevent a continuing or a threatened breach of said contract; and that the agreement in said contract providing for said relief is valid and enforceable, and said provision is not harsh, inequitable or unreasonable.

"6. That the provision in said contract for the payment of an attorney's fee in the event of a breach or threatened breach and the successful termination of any action against defendant arising out of such breach or threatened breach, is legal, valid and enforceable.

"7. That the clause in said contract providing for the payment by the defendant of the sum of five cents per pound on each pound of tobacco sold to persons or corporations other than the plaintiff, said five cents per pound being liquidated damages, is a valid provision, and is enforceable as such, the same providing for the payment of liquidated damages, and is not a penalty."

The Bingham Co-operative Marketing Act is of the type now familiar in most, if not all, agricultural sections of the union, and identical in its essential features with acts that have been enacted quite recently in about 30 states, and upheld so far by the courts of last resort in

North Carolina, Oregon, Mississippi, Texas, Kansas, and Wisconsin. Tob. Growers Co-op. Ass'n v. Jones, 117 S. E. 174; Ore. Growers v. Lentz, 212 Pac. 811; Brown v. Staple Cotton Ass'n 96 So. 849; Texas Cotton Ass'n v. Stoval, 253 S. W. 1101; Kansas Wheat Growers Ass'n v. Shulte, 216 Pac. 311; N. W. Wisconsin Pool v. Bekkedal, 196 N. W. —.

As the provisions of these acts are either quoted in full or summarized in these cases, we deem it unnecessary to state them here. Indeed in view of the settled rule in this state and elsewhere, that if there is doubt as to the validity of a statute it will be upheld (Chesapeake Stone Co. v. Moreland, 126 Ky. 656, 104 S. W. 762; Dwiggins Wire Fence Co. v. Patterson, 166 Ky. 278, 179 S. W. 224; Clay, Ins. Commissioner v. Dixie Fire Ins. Co., 168 Ky. 315, 181 S. W. 1123), we probably would be justified in declaring the Bingham Act constitutional without further discussion, upon the persuasive authority of the above cases, since there is no contrary decision, nor even a dissenting opinion, in any of the cases in which these acts have been considered in relation to section one of article 14 of the federal Constitution, and such unanimity of opinion could hardly prevail if the constitutionality of such acts were less than plain.

Not only so, but every other objection now raised to the act, the contract and the remedies prescribed in both the act and contract, is likewise disposed of in some or all of those cases. We prefer, however, to state briefly our own reasons for like conclusions upon each of these questions, except that we will not notice the second and sixth as numbered in the lower court's judgment *supra,* since they are expressly abandoned by appellant as being untenable.

The first and third contentions are somewhat related, and will be considered together. It is upon the hypothesis that the act permits, through an improper classification of citizens, and the appellee accomplishes, through its contracts with appellant and other tobacco growers, a monopoly or unreasonable restraint of trade, that it is insisted the act offends the Fourteenth Amendment and the contract violates the Sherman Anti-Trust Act of Congress.

There is, however, neither allegation nor proof that a monopoly actually has been created, or that trade has

been restrained by appellee, hence it is clear the contract cannot be annulled as violative of the anti-trust provisions of either the Sherman Act or the common law now in force in this state. United States v. U. S. Steel Corp., 251 U. S. 417; International Harvester Co. v. Kentucky, 234 U. S. 216; Standard Oil Co. v. United States, 221 U. S. 1; United States v. Am. Tob. Co. 221 U. S. 106; Collins v. Comth. 234 U. S. 634; Owen Co. Society v. Brumback, 128 Ky. 137, 107 S. W. 710; Comth. v. International Harvester Co., 131 Ky. 551, 115 S. W. 703; Comth. v. Hodges, 137 Ky. 233, 125 S. W. 689; Collins v. Comth, 141 Ky. 564, 133 S. W. 233; International Harvester Co. v. Comth. 144 Ky. 403, 138 S. W. 248; L. & N. R. Co. v. Burley Tob. Soc. 147 Ky. 22, 143 S. W. 1040.

Indeed, since the Clayton amendment of the Sherman Act expressly exempts agricultural and horticultural organizations instituted for the purpose of mutual help and not having capital stock or conducted for profit from anti-trust provisions, it recognizes as reasonable a classification based upon such pursuits.

Hence the Sherman Act as amended is itself expressive of a change in the public attitude and policy toward agricultural and horticultural pursuits in relation to other business activities and a recognition of a necessity for the public welfare of permitting organization among such citizens to enable them to meet justly and without undue advantage the conditions they encounter in necessary trade relations with other citizens, or rather groups.

Nor are the Clayton Act and the many other recent acts of Congress treating farmers as a distinct class the only expressions of such a change in public opinion and the public policy of our nation with reference to them and their economic problems. The enactment by the legislatures of thirty or more of the states of enabling acts precisely like the Bingham Co-operative Marketing Act is further evidence of the present state of public opinion on the matter, as is the attitude of every other agency through which an enlightened public policy may be declared, including the most recent *resume* of the state of the union by the President of the United States.

The basis of this change in public opinion toward combination and classification is not in any sense political but economic rather, and, in our judgment, it is be-

cause of basic economic conditions affecting vitally not only the farmers but also the public weal, that the classification based upon agricultural pursuits is reasonable, just, and imperative for the good of the entire nation and every citizen thereof. If this be true, the Bingham Act is based upon a classification that is not offensive to the equal protection provisions of the Fourteenth Amendment. City of Louisville v. Coulter, 177 Ky. 242, 197 S. W. 819; Owen County Society v. Brumback, 128 Ky. 137, 107 S. W. 710; Douglas Park Jockey Club v. Talbott, 173 Ky. 685, 191 S. W. 474; Comth. v. Remington Typewriter Co., 127 Ky. 177, 105 S. W. 399; Barbier v. Connelly, 113 U. S. 27; So. Carolina v. McMaster, 237 U. S. 63; American Sugar Refining Co. v. Louisiana, 179 U. S. 89; German Alliance Ins. Co. v. Lewis, 233 U. S. 389; N. Y. Central R. R. Co. v. White, 243 U. S. 188; Ward v. Krinsky, 42 Supr. Ct. Rep. 529; Smith v. Kans. City Trust Co., 255 U. S. 180; National Union Fire Ins. Co. v. Wanberg, 260 U. S. 71; Duplex Printing Co. v. Dearing, 254 U. S. 443; Connolley v. Union Sewer Pipe Co., 184 U. S. 541.

The fact that other productive groups can, do, and for many years have marketed their wares as groups and not as individuals, and that they are and have been enabled through group organization or "gentlemen agreements" to regulate the distribution and stabilize the prices of their products, is a fact known of all men, which can neither be denied nor blinked by the courts; as is also the fact that farmers, if unorganized, necessarily act as individuals and not as groups in marketing their products, resulting in "dumping" by the farmers, distribution by speculators, an unconscionable and uneconomic spread between producer and consumer in the necessities of life, and an inevitable demoralization of basic economic conditions, to the hurt directly or indirectly of every citizen.

With a clear recognition of this fact borne in upon the public conscience by the threatened economic collapse of the farming industry indispensable to public welfare and national stability, if not national existence, an enlightened public opinion unmistakenly demands that farmers be permitted to organize for the marketing of their crops, not merely for their own protection but for the public good.

But what has current public opinion with reference to economic questions to do with constitutional inhibitions and guaranties? Just this. It often as here affords the proper and usual approach for a consideration of their terms and meaning.

That all law, even constitutional law, is not static but progressive and in step always with sound economic conditions and an enlightened public policy, recently has come to be realized clearly, if ever it may have been thought otherwise, as is attested by highest judicial and lay utterances.

The best evidence of the sure foundation of the federal Constitution is not that it was declaratory of the highest conceptions of truth and justice with reference to community life when it was written, but that correctly interpreted it is equally so today despite the many changes time and experience have brought in such conceptions. The Constitution in the Fourteenth Amendment declared the public policy of equal protection of the laws, unalterably both then and now it is true except by formal amendment, but being written for time rather than a day most wisely left it to the legislatures and the courts to provide the means and define the terms in accordance with an enlightened public consciousness which continually strives toward, and constantly attains if but slowly and haltingly, a better understanding of community life. Unquestionably as that complex problem is understood by the best thought of today the Bingham Act, by enabling the farmers to market their crops co-operatively for the purpose, as declared in the act, of regulating distribution and stabilizing the prices of farm products, serves a pressing public need that justifies the classification of farmers as a distinct class and treats all of the class equally and fairly and not better, if that were important, than other distinct productive classes are treated under the laws of the state and nation. It does not, therefore, offend the equal protection provisions of the federal Constitution, notwithstanding the fact that twenty-one years ago the Supreme Court of the United States in the case of Connolley v. Union Sewer Pipe Co., *supra,* indicated a somewhat contrary view, but which is, under the more recent decisions of that court, easily distinguished upon several grounds.

We therefore hold that the act is valid, and that appellant's contract with appellee does not by itself, nor when considered in connection with other like contracts, violate the Sherman Anti-Trust Act as amended.

With reference to the contention that the contract is unilateral, little need be said, since in consideration of appellant's promises appellee agreed specifically to receive, handle and market the tobacco appellant and other members deliver to it, and to settle therefor according to stipulated terms. Furthermore, appellant's agreements were made in consideration of like agreements of other members and for their mutual advantage, and whichever way the matter is viewed there is no lack of mutuality.

The remaining contentions relate to the remedies available to appellee to enforce compliance by appellant and for his breach of contract. Both the statute and the contract provide for injunctive relief to prevent a breach, and for liquidated damages as compensation therefor.

Appellee has no capital stock, is not operated for profit, and is not permitted to buy, handle or sell tobacco except for its members, but is dependent for its existence and an opportunity to serve its members upon their observance of their contracts. It would be utterly impossible to ascertain the damage that would result to the co-operative effort from a breach of their like contracts by one or more members, and it was both wise and provident, if not essential for attainment of their purposes, that they agree on a basis for estimating same, and the legislature, in recognition of that fact, expressly authorized them so to do, although that right clearly existed without such express authority. Nor do we regard, and certainly we cannot say in the absence of proof, that five cents a pound is unjust or oppressive, or out of all proportion to the damage which would result from such a breach.

Hence the sum so fixed must be construed as liquidated damages rather than a penalty, and is collectible. Walton, etc. v. McKirtrick, 141 Ky. 415, 132 S. W. 1046; Fiscal Court Franklin Co. v. Public Service Co., 181 Ky. 245, 204 S. W. 77.

For the same reasons, we think injunctive relief would be allowed upon general principles to prevent a breach of this contract by any member, even if it were not expressly allowed by the Bingham Co-operative Marketing Act (Grant Co. Board v. Allphin, 152 Ky. 280, 153

S. W. 417), and we do not doubt that the legislature has the power to prescribe appropriate remedies to prevent or redress civil wrongs, and that it did not in this act transcend such power, as was held in some of the cases *supra* upholding similar acts and provisions.

For the reasons indicated, the judgment is affirmed. The whole court sitting.