In the Superior Court of the State of California
In and for the County of Ventura.

California Prune and Apricot Growers' Association, Plaintiff,

vs

M. Willett, Defendant.

No. 9468.

Also Nos. 9447 to 9467 inclusive; 9546 to 9552 inclusive; 9558 to 9560 inclusive.

2

## OPINION

MERLE J. ROGERS, Judge

By stipulation these twenty-five cases have been consolidated for trial. The first nineteen complaints were filed on August 28, 1924, and are identical except for the name of the defendant. The last six cases were filed on October 24, 1924, and each contains the additional allegation that the defendant therein has sold a part of his fruit. By the action plaintiff seeks specific performance of a membership and marketing contract executed by the respective defendants and seeks to enjoin defendants from delivering apricots to anyone else in violation of said contract. The answers set up a variety of defenses, and by cross-complaint defendants seek to decree cancelling the agreement, permitting defendants to withdraw

from the Association, for an accounting, and for damages.

The plaintiff is a non-profit co-operative marketing association composed of more than ten thousand members each of whom is a grower of either prunes or apricots or both within the state of California and each of whom has executed a contract identical with that involved in these actions. Except in a few instances, all of the defendants signed the contract in the spring of 1921, at which time the present Association was formed, being a reorganization of a prior association to which all but six of the present defendants belonged. The contract as signed by all of the members, including defendants, contains the following provisions:

"2. The Association agrees to buy and the Grower agrees to sell and deliver to the Association all of the prunes and apricots and apricot pits produced or acquired by or for him in California, during the years 1922, 1923, 1924 and 1925; and, at the option of the Association, the years 1926, 1927 and 1928. This option shall be irrevocable; and shall cover the total period of three years; and shall be exercised, if the Association deems it advantageous to the growers as a whole, before April 30, 1926, by notice mailed to each grower at his address noted below."

"15. This agreement is one of a series generally similar in terms, comprising

with all such agreements, signed by individual grower, or otherwise, one single contract between the Association and the said Growers, mutually and individually obligated under all of the terms thereof. The Association shall be deemed to be acting, in its own name, for all such growers in any action or legal proceedings on or arising out of this contract.

"16. (a) Inasmuch as the remedy at law would be inadequate and inasmuch as it is now and ever will be impracticable and extremely difficult to determine the actual damage resulting to the Association, should the Grower fail so to sell and deliver all of his prunes and apricots and pits, the Grower hereby agrees to pay to the Association for all prunes and apricots and pits withheld, delivered, sold, consigned or marketed by or for him other than in accordance with the terms hereof the sum of two cents per pound of prunes, and particularly the sum of four cents per pound of prunes running larger than thirty to the pound and the sum of four cents per pound of apricots and ½c per pound of apricot pits, as liquidated damages for the breach of this contract, all parties agreeing that this contract is one of a series dependent for its true value upon the adherence of each and all of the Growers to each and all of the said contracts."

"18. The parties agree that there are no oral or other conditions, promises,

covenants, representations or inducements in addition to or at variance with any of the terms hereof, and that this agreement represents the voluntary and clear understanding of both parties fully and completely."

The government of the Association is in a board of fifteen directors, fourteen of whom are elected by the members from the membership and distributed geographically to the various districts of the State; one director may be a person nominated by the Governor of the State of California, but even such person must be first approved by the voting board of the Association.

There was a serious legal question as to the constitutionality of the provision in the contract for specific performance, particularly because of the claimed lack of mutality, and to remedy this condition the Legislature of California in 1923 enacted the "Co-operative Marketing Act," which gives to such associations, in terms, the right of specific performance and injunction, and the constitutionality of this Act is the really serious question in the present cases. At the time these cases were tried there was pending in the Supreme Court a case in which this precise question was involved, and the trial court hoped that this fundamental point would be determined by the court of last resort so that its decision would be available in these cases. However, the Supreme Court dismissed the bill in that case without passing upon the question; so this Court is left to do the best it can with the problem unassisted by the

views of the higher Court. The defendants contend that this law is unconstitutional, and urge that it is special legislation granting privilege and remedy to one class which is denied to others; that it attempts to regulate the practice of the courts, and that the existing provisions of the Civil Code with reference to the necessity of mutuality are not overcome by the new statute.

A similar, and in most respects identical, co-operative marketing statute has been adopted in more than thirty states. Its provisions, including the remedies of specific performance and injunction, have been passed upon and upheld by the respective courts of last resort in a number of these states:

> Oregon Growers' Co-operative Ass'n. vs. Lentz, 212 Pa. 811. Kansas Wheat Growers' Association vs. Schulte, 216 Pac. 311. Texas Cotton Association vs. Stovall, 253 S. W. 1101. Potter vs. Dark Tobacco Growers' Ass'n., 257 S. W. 33 (Ky.). Tobacco Growers vs. Jones. 117 S. E. 174 (N. C.). Dark Tobacco Growers vs. Mason (Tenn., 1924).

The latest case appears to be Dark Tobacco Growers' Co-operative Association vs. Dunn, decided by the Supreme Court of Tennessee after the present cases were tried, in which the statute is sustained and held to be based upon a reasonable classification. In the opinion the Court says:

> "In our opinion, the classification of farmers into co-operative associations for

the purpose set forth in the Act is reason-
able and natural, and one that should
prove beneficial rather than detrimental
to the public."

No case has been cited, and I know of none,
where any supreme court has held the act to be
unconstitutional or refused to enforce contracts
thereunder. Counsel for defendants, both in oral
argument and in a great many pages of written
brief, have presented and urged many contentions
against the validity of the Act, displaying com-
mendable research and no little persuasive reason-
ing; but, to borrow the language from the Potter
case in 257 S. W.:
"Every objection now raised to the Act,
the contract and the remedies prescribed in
both act and contract is disposed of in
some or all—"
of the cases cited above.

I can see nothing in the other provisions of the
Code with reference to the remedy of specific per-
formance, or in the existing other statutes with
reference to co-operative associations, which takes
the co-operative marketing statute out of the rea-
soning of these cases from other jurisdictions, and
I believe the California Act, Title XXIII of the
Civil Code, to be constitutional and valid.

In associations formed under the marketing
Act the members are the real parties in interest.
The Association consists entirely of producers, and

they are associated together for the purpose of marketing their products for their mutual protection and benefit. The statute in no wise affects any producer unless and until he voluntarily becomes a member of the Association; and when a grower does become a member, under his contract he agrees with all the other members, through their mutual medium, the Association, that in the event of a breach of the contract by him the remedies as provided both in the contract and in the statute shall be available against him. Perhaps it is not too much to say that it is a matter of common knowledge that without some such remedy co-operative marketing cannot successfully function.

The statute of 1923 provides for its adoption by an existing association upon vote of its members, at a meeting held for that purpose after notice; and the contention is most earnestly made that plaintiff Association never legally adopted the statute because a notice of the meeting was insufficient in form and was not in fact mailed to these defendants. While the notice might well have been more explicit, yet it is sufficient, and, read with the letter which accompanied it, as it may be, it is amply so.

The question as to the mailing of the notice presents an interesting situation: Nearly every one of the defendants testified that he had no recollection of receiving such a notice, or positively that he did not receive it. Now this Court is privileged to have a personal acquaintance with practically every defendant who so testified, and such is my knowledge of their standing and credi-

bility that if they had testified to the recollection of an affirmative fact I can hardly conceive of a set of counter circumstances which would shake my conviction in the correctness of their recollection. I am sure these defendants believe that they testified truly; but I know, as a matter of psychology, based both upon personal experience and observation, that no man can safely testify positively to a negative, to something which he thinks did not happen, unless the negative episode be of such a striking character that it may be said that he must have remembered had it happened. The new statute in fact made practically no change in the terms of the contract the defendants had already signed, and it is probable that the growers paid but little attention to the notice of this particular meeting; and against defendants' attempted recollection of the negative we have the positive testimony of the affirmative fact that the notices were mailed. The mailing was done by a mechanical device which the Court knows is manifestly more reliable in its action than that of any human agency, however efficient. The testimony of the operatives of this machine is direct, affirmative and positive; the notices were received by growers in this County; there was absolutely no object or reason why the notices should not have been sent out in regular course, and any suggestion that the Association, a year before these suits were filed, purposely omitted to send the notice to these defendants cannot be seriously intended, even if it were not refuted by the fact that one of the defendants did receive a notice and produced it at the trial. The Association was only bound

to mail the notices, not to follow them or guarantee their actual delivery to each grower.

I cannot escape the conviction that these notices were mailed as required; and, being compelled to so find, it follows that even if the general proxies were insufficient for such meeting (which I do not believe), defendants have waited too long to be permitted now to question the authority of their proxy-holders.

The testimony is entirely insufficient to sustain the defense that the execution of the contracts was induced by "mistake, misapprehension, unfilled promises, fraud and false representations." It is elementary that a mere expression of opinion, or a promise of a solicitor as to future policy, or alleged statements of hoped-for returns are not sufficient upon which to void a contract; besides, the contract itself, as already quoted, provides that no oral representations can vary the terms of the written agreement. There is no suggestion that the growers did not have every opportunity to read and understand the contract; on the contrary, it is very evident that the campaign for signatures to the contract occupied some considerable period during which there must have been a great deal of discussion on the subject.

The only phase of this defense worthy of consideration is the allegation that the statement was made to those who joined after the membership agreement had become operative that the required seventy-five per cent of the acreage had been secured and the allegation that this statement was not true. This might be a somewhat difficult

question of fact to decide if there were no burden of proof or presumptions involved. On this phase of the case the Court admitted testimony offered by defendants which I then believed to be and am now quite sure was incompetent; but even leaving that testimony in the scales, the evidence fails to meet the burden of proof or overcome the presumption of the certificate, even if we disregard the fact that the certificate is, by the terms of the contract itself, made absolutely conclusive.

As to withdrawals, defendants seem to contend that because of the provision that a by-law would be adopted providing for withdrawals from the Association itself such provision should be in effect during the term of the marketing agreement, although in direct violation of the express contract terms thereof. I can see no merit in this contention.

A number of contentions are made as to the Association's manner of conducting its business, and its business policy, and its bookkeeping, what counsel is pleased to call "juggling of the accounts" and "general malfeasance." Durnig the trial a very large amount of testimony was taken and exhibits introduced concerning these allegations. It was conceded by defendants that in the preparation for the trial access to the records of the Association was freely given, and this permission was evidently taken advantage of thoroughly by defendants and the records examined, both by counsel and by expert auditors, and depositions of the officers of the Association taken in preparation for the trial. Certainly, on the trial

the doors were opened wide for the admission of any evidence offered along this line. There were shown instances of poor judgment; on the trial some of plaintiff's explanations as to some of the bookkeeping processes were not at the time clear to me; however, upon a further examination of the exhibits involved I believe the difficulty disappears; and it may be said that in view of the great volume of business done, running into hundreds of millions of pounds of fruit per annum, it is surprising that more was not found to criticize along this line.

The Association sold to the packers; that may be bad policy; on the other hand, it may have been for the moment a necessary policy; I do not know. It seems to have been done before in the Association, and I find nothing in the contract which forbids it. There is no showing of bad faith. It is easy to look back at the event and discern a wiser course. It must be kept in mind that such mistakes as were made were mistakes of defendants' own Association; under its government each of the defendants had exactly the same voice, power and responsibility as every other member, and these particular defendants were at all times represented on the board of directors by members elected from this County by themselves. In its machinery of government the Association is very democratic; none but the growers has a voice; each grower has an equal voice; they select their own representatives; they even have the right to recall a director. Under such an association it cannot be that mere mistakes of policy entitle an individual member to violate his contract with the other members.

It is entirely beside the mark to say that defendants should be entitled to prevail in this action simply because they could have sold their fruit to an independent dealer, either at the time of their refusal to deliver or at the time of the trial, for a price greater than that at which the Association sold a proportion of the crop at the opening of the marketing season. By their contract defendants committed to the Association the discretion as to when to market. In the absence of fraud, and none is shown, it is the judgment of the Association which must govern. Besides, the Court could not assume either that under other conditions the market would have acted the same, or that these defendants would have had the provision to hold their fruit and sell only at the top of the market.

The long delay in making settlement for the 1922 and 1923 apricot pools is evident, and is a proper matter of criticism. During a considerable portion of this period undoubtedly the Association did not function nearly as efficiently as it should have; there was internal dissension and turmoil running many weeks and resulting in a change of management; but because the Association, by reason of internal troubles, failed for a time to function properly is no legal reason why members may, by the violation of their contracts, prevent it from functioning at all.

The testimony shows that no payment for the 1923 pool was due and unpaid to these defendants at the time they refused to deliver their fruit. Since these suits were filed amounts have accrued on the 1923 crop which of course should now be

paid, and it seems to me that the defendants are entitled to legal interest upon these amounts from the time at which the Association first learned that a particular defendant had not sold his fruit outside, and certainly this fact became manifest on the trial of the actions. As to those defendants who did sell their fruit outside prior to the service of restraining orders hereunder, the Association is entitled to retain the remaining proceeds of the 1923 crop to apply on the amount of liquidated damages due from such defendants.

The failure of the Association to pay the amounts on the 1923 pool accruing after the breach of the contract by defendants obviously is no defense either to the Association's right or remedy.

Permission of the Court to amend the complaint as against those defendants who had appeared and sold their fruit before the restraining orders were served was properly given, and the Association is entitled to judgment in those cases for the liquidated damages (instead of speecific performance) and to the remedy of injunction.

In the action in which R. A. Gates is defendant the additional defense is made that the contract is void because executed before he was twenty-one years of age. Assuming that the contract does make a delegation fo power inhibited by Sec. 33 of the Civil Code (and at least to the extent of granting a proxy it surely does), should he be permitted to raise this defense under the facts? After he became of age he delivered his fruit to

the Association, and received, accepted, cashed and retained the proceeds of checks in payment therefor. He claims that he does not own the land the crop on which he contracted to deliver; but in the contract he "warrants that he is in a position to control said crop and able to deliver." He delivered two crops grown on the premises and waited until a third crop was ready for delivery, and more than a year after he reached his majority, before he made any complaint or gave any notice to the Association of the fact of his incapacity at the time the contract was signed. He is now estopped to deny the validity of his contract or the truth of his warranty. I believe, also, that under the facts as disclosed in the Canet Company and Gorril-Walker Company cases those corporations are estopped now to deny either their power to make the contract or their formal execution thereof.

Even if malfeasance, fraud or bad faith on the part of the officers of the Association were shown (and the evidence does not disclose it), such conduct, it seems to me, should be met and corrected within the Association, and should not, and under the law as I see it does not, relieve individual members from their contract obligations to the Association or deprive the Association of the remedies which those contract obligations grant to it. Each member contracts not merely with the Association as an entity, but with every other of the ten thousand members who join; and it is the right of every member to have every other member meet his obligation under the mutual and co-operative contract. Defendants' counsel during all of the testimony and on the argument have con-

tinually urged and stressed the unfortunate situation of the local aprciot growers, which is evident; but unless some legal reason is shown to justify a breach of the terms of the contract courts must hold the makers of contracts to their obligations thereunder. It is entirely possible that the union of the prune and the apricot in a marketing marriage is unhappy, but I know of no power in the Court to divorce them from the obligations of their association vows by them voluntarily given in the contract.

All through the case, defendants' counsel have sought to portray the Association as an entity independent of, if not antagonistic to, the individual growers, an organization seeking to make as small a return to the producer as possible, and in some undisclosed manner to profit at his expense. Neither the nature of the Association nor the evidence in the case justifies the picture. The returns to the local apricot growers have for several years been very unsatisfactory. Other agricultural products have also from time to time sold close to the cost of production. Such a situation is deeply deplorable, not only with reference to the individual grower, but to the entire community as well. The Court knows that such conditions obtained, from time to time, in the years before co-operative marketing was undertaken; and it was to better this condition that the growers themselves formed the Association. But co-operative associations, as well as all other marketing agencies, are subject to the law of supply and demand, to the changing economic and business conditions and to errors of marketing judgment.

Defendants have also portrayed the "Independent Packer" in dark and sinister guise; and if the co-operative marketing system fails, who else is left through whom the growers may market?

But neither the situation of the local grower nor the defects or delinquencies of the co-operative method or of the independent packer is on trial here. We are legally permitted to be concerned only with the validity of a statute, the construction of a contract thereunder, and the right of the Association, under all the evidence, to the remedies provided therein; and having found the statute valid, and the Association entitled to the rights and remedies sought under the contract, this Court can do no other than so decree.

Plaintiff's counsel may prepare, serve and present a form of decree in accordance therewith.

Done this March 5th, 1925.

MERLE J. ROGERS,
Judge of said Superior Court.