LAND, J.
 

 This is a suit by plaintiff, Association, against defendant, one of its members, to compel the specific performance of an agreement signed by defendant to deliver to plaintiff all cotton owned, produced, controlled, or acquired by defendant during the years 1924, 1925, 1926, and 1927, and particularly a number of bales of cotton of the 1924 crop, and to recover as liquidated damages the sum of $3,750 for cotton which defendant failed to deliver under said agreement, together with the additional sum of $1,000 as attorney’s fees.
 

 Plaintiff, Association, obtained a restraining order temporarily prohibiting defendant from selling, delivering, or otherwise disposing of any cotton owned, produced, controlled, or acquired by or for him during the years 1924, 1925, 1926, and 1927 to any person or persons other than plaintiff.
 

 Plaintiff, Association, also caused to issue a writ of sequestration for the seizure of all cotton owned, raised, acquired, or controlled by defendant during the year 1924.
 

 In answer to the rule to show cause why a preliminary injunction should not issue as prayed for by plaintiff, Association, defendant admits signing the agreement which is sought to be enforced in this ease, but alleges that said agreement is not binding upon him, and is null and void and of no effect for numerous reasons, among which are the following:
 

 (1) That Act No. 57 of the year 1922, under which plaintiff, Association, is organized, is unconstitutional, null, and void, as said act embraces more than one object, and the title is not indicative of such object, in violation of section 16 of article 3 of the Constitution of 1921.
 

 (2) That said act is in contravention of section 14 of article 19 of the Constitution of 1921.
 

 (a) Section 16 of article 3 of the Constitution of 1921 declares that:
 

 “Every law enacted by the Legislature shall embrace but one object, and shall have a title indicative of such object.”
 

 
 *299
 
 Act 57 of 1922 is entitled:
 

 ' “An act to authorize the formation of associations of producers of agricultural products, and to provide punishment for the violation theréof.”
 

 The act clearly indicates in the title its object, and an examination of the various sections of the act shows that its provisions are germane to the object contemplated, and have been enacted solely for the purpose of carrying this object into effect.
 

 . “To incorporate a [corporation] is to create it with certain powers and privileges; those powers * * * need not be detailed, for if they were, the title would be as long as the act.” Orescent City Gaslight Co. v. New Orleans Gaslight Co., 27 La. Ann. 138.
 

 AS the conferring of rights and privileges upon a corporation is incidental and germane to • its incorporation, Act 57 of 1922 is not amenable to the objection that it has more than one object. St. Anna’s Asylum v. Parker, 109 La. 592, 33 So. 613.
 

 (b) Section 14 of article 19 of the Constitution of 1921 provides that:
 

 “It shall be unlawful for persons or corporations, .or their legal representatives, to combine or conspire together, or to unite or pool their interests for the purpose of forcing up or down the price of any agricultural product or article of necessity,
 
 for speculative purposes;
 
 and all combinations, trusts, or conspiracies in restraint of trade or commerce, and all monopolies or combinations to monopolize trade or commerce, are hereby prohibited in the state of Louisiana,” etc.
 

 Section 1 of Act 57 of 1922 declares:
 

 “That in Order to promote, foster and encourage the intelligent and orderly marketing of agricultural products through co-operation
 
 and to. eliminate speculation,
 
 unnecessary middlemen and waste; and to make the distribution of agricultural products as direct as can be efficiently done between producer and consumer,
 
 and to stabiViee the marketing of agricultural products,
 
 this act is passed.”
 

 It is clear that the avowed purpose of any association organized under the act is to stabilize the price of cotton, or other agricultural products, so that such price will be uniform throughout the year, and not to force up or down the price of such products for merely speculative purposes. The act, apparently, does not contemplate ahy monopoly to corner the market, but merely permits associations organized under it to handle cotton produced or controlled by its own members, solely upon a co-operative marketing plan or basis.
 

 Upon its face, Act 57 of 1922 does not authorize the making of a contract or the forming of a conspiracy or combination in restraint of trade.
 

 It is therefore incumbent upon defendant to prove that a monopoly has been created, or that trade has been restrained by plaintiff, Association, in order to annul the agreement signed by him. This defendant has failed to do.
 

 It is evident, therefore, that neither the act, nor the contract made under it by defendant, can be annulled in this case as violative of section 14 of article 19 of the Constitution of 1921. Potter v. Dark Tobacco Growers’ Co-op. Ass’n, 201 Ky. 441, 257 S. W. 33; Oregon Growers’ Co-op. Ass’n v. Lentz, 107 Or. 561, 212 P. 811; Tobacco Growers’ Co-op. Ass’n v. Jones, 185 N. C. 265, 117 S. E. 174, 33 A. L. R. 231; Kansas Wheat Growers’ Ass’n v. Schulte, 113 Kan. 672, 216 P. 311.
 

 3. Defendant also attacks the marketing agreement in this case as a unilateral contract and therefore void for lack of mutuality.
 

 We cannot concur in that view of the case.
 

 Plaintiff, Association, promises upon its part:
 

 (A) To buy all the cotton produced by or for defendant, or acquired by him. as landlord or lessor, during the years 1923, 1924, 1925, 1926, and 1927. Section 2.
 

 (B) To make rules and regulations and provide inspectors or graders to standardize
 
 *301
 
 and grade the quality and method of handling, pressing and shipping the cotton. Section 4.
 

 (O) To pool or mingle the cotton with that of like variety, grade, and staple delivered by other growers, and to grade the cotton. Section 5.
 

 (D) To resell the cotton and to pay the grower the net proceeds less authorized deduction. Sections 6 and 7.
 

 (E) To borrow money on the delivered cotton, prorate it among the growers, and to accept drafts drawn against it. * Section 9.
 

 Defendant promises upon his part:
 

 (A) To sell and deliver to the Association his cotton for the years 1923, 1924, 1925, 1926, and 1927. Sections 2, 11, 12, 13A.
 

 (B) To deliver at the earliest reasonable time at specified warehouses. Section 4A.
 

 (0) To mail statistical data to the Association when requested. Section 14.
 

 (D) To deliver to the Association any of the 1922 crop on hand. Section 17.
 

 It is true that the Court of Civil Appeals of the state of Texas, in Texas Farm Bureau Cotton Association v. Stovall, 248 S. W. 1109, declared a marketing agreement, similar to that now before us, to be a unilateral contract and void for lack of mutuality of obligation.
 

 The Supreme Court of Texas, however, reversed the decision of the Court of Civil-Appeals, in Texas Farm Bureau Cotton Association, 113 Tex. 273, 253 S. W. 1101, holding:
 

 “That the promises in the agreement are mutual, that there is an ample valid consideration, and that the contract is not subject to the criticism that it lacks in mutuality or is unilateral.”
 

 This view, in our opinion, is correct, and has been approved in the following cases: Burley Tobacco Society v. Gillaspy, 51 Ind. App. 583, 100 N. E. 89; Milk Producers’ Marketing Co. v. Bell (July 24, 1924), 234 Ill. App. 222; Potter v. Dark Tobacco Growers’ Co-operative Association, 201 Ky. 441, 257 S. W. 33; Hollingsworth v. Texas Hay Association (Tex. Civ. App.) 246 S. W. 1068;-Minnesota Wheat Growers’ Co-operative Marketing Association v. Huggins (Minn.) 203 N. W. 420; Warren v. Alabama Farm Bureau Cotton Ass’n (Ala. Sup.) 104 So. 264, 266.
 

 4. Defendant also contends that the contract signed by him is based upon a potestative condition on the part of plaintiff, Association.
 

 “The potestative condition is that which makes the execution of the agreement depend on' an event which it is in the power of the one or the other of the contracting parties to bring about or to hinder.” R. C. C. art. 2024.
 

 “Every obligation is null, that has been contracted, on a potestative condition, on the part of him who hinds himself.” R. C. O. art. 2034.
 

 “The last preceding article is limited to potestative conditions, which make the obligation
 
 depend solely on the exercise of the obligor’s mil;
 
 but if the condition be, that the obligor shall do or not do a certain act, although the doing or not doing of the act depends on the will of the obligor, yet the obligation depending on such condition, is not void.” R. C. C. art. 2035.
 

 Plaintiff, Association, has bound itself to do certain acts, but we find nothing in the marketing agreement that makes the obligation of said Association rest solely on the exercise of its will. The obligation arising from the marketing contract in this case is not contingent, therefore, as to its performance by plaintiff, Association, upon a potestative condition.
 

 5. Defendant attacks this agreement as null and void also upon the ground that it seeks to declare a sale to it of defendant’s cotton, although no price is fixed.
 

 The marketing agreement, section 2 (a), provides that:
 

 “The association agrees to buy and the grower agrees to sell and deliver to the association all of the cotton produced or acquired by him or for him in Louisiana during the years 1923, 1924, 1925, 1926 and 1927.”
 

 Section 5 provides that:
 

 
 *303
 
 The “association will resell all cotton and pay net proceeds to growers; costs of operation and overhead will be deducted, but thé association Is forbidden to make any profit for itself.”
 

 ¡Section 6 provides that:
 

 “The association agrees to resell such cotton, together with cotton of like variety, grade, and staple, delivered by other growers under similar contracts,
 
 at the best prices obtainable by it under marlcet conditions;
 
 and to pay over the net amount received therefrom (less freight, insurance, and interest) as payment in full to the grower and growers named in contracts similar hereto, according to the cotton delivered by each of them, after deducting therefrom, within the discretion of the association, the costs of maintaining the association, and costs of -handling, grading, and marketing such cotton, and of reserves for credits and other general purposes (said reserves not to exceed one per cent, of the gross resale price). The annual surplus from such deductions must be prorated among the growers delivering cotton in that year on the basis of deliveries.”
 

 Section 8 provides that:
 

 “The grower agrees that the association shall borrow money in its name on the cotton by the issuance of commodity bonds, or bearer certificates, or through drafts, acceptances, notes, or otherwise, or on any warehouse receipt or bills of lading, or upon any accounts for the-sale of cotton, or on any commercial paper delivered therefor. The Association shall prorate the money so received among the growers equitably, as it may determine, for each district and period of delivery.
 

 “The association agrees to accept drafts drawn against it by the grower for any amount specified and determined by it, upon delivery of cotton hereunder, and to assist the grower to discount such drafts, when secured by the warehouse receipts, through the most advantageous banking system.”
 

 Section 18 (b) provides that:
 

 ■ “The grower agrees that in the event of a breach or threatened breach by him of any provisions regarding delivery of cotton, the associ¿tion shall be entitled to an injunction to prevent breach or further breach hereof
 
 and to a decree for specific performance hereof; and the parties agree that this is a contract for the purchase and sale of personal property under special circumstances and conditions,
 
 and that the buyer cannot go to the open market and buy cotton to replace any which the grower may fail to deliver.”
 

 The marketing contract signed by the defendant in this case is based, as to the nature of the contract between the parties, upon section 16 of Act 57 of 1922, which reads as follows:
 

 “The association and its members may make and execute marketing contracts, requiring the members to sell, for any period of time, not over ten years, all or any specified part of their agricultural products or specified commodities exclusively to or through the association, or any facilities to be created by the association.
 
 If they contract a sale to the association, it shall be conclusively held that title
 
 to'
 
 the products passes absolutely and unreservedly, except for recorded liens, to the association upon delivery, or when put in merchantable condition, or at any other specified time if expressly and definitely agreed in the said contract"
 

 “The contract may provide that the association may sell or resell the products delivered by its members,
 
 with or without talcing title thereto;
 
 and pay over to its members the resale price, after deducting all necessary selling, overhead and costs,” etc.
 

 We are dealing here with a special form of statutory contract, whose nature and legal effect are defined and determined by the act under which the contract has been made between the parties. .It is clear, therefore, that such agreement need not conform to the essentials of an ordinary contract ,of sale as to the certainty of the price. Indeed, it would not be possible to fix a definite price in advance as to the resale of cotton in the future by plaintiff, Association, and carry out the object for which -the Association has been organized. To fix the price beforehand would defeat the very purpose of the Association in its efforts to obtain the best price under market conditions, as such price might fall- below the current price at ■ the date when the Association should deem it advisable to sell, thereby entailing a loss upon the grower, or it might prevent the sale entirely
 
 *305
 
 if the fixed price should be higher than the market quotation.
 

 6. The final contention of the defendant is that the marketing agreement in this case is stricken with nullity because it imposes upon him the fulfillment of impossible and illegal conditions, in this that said agreement seeks to obligate defendant to deliver to plaintiff, Association,
 
 cotton which he does not own, and cotton incumbered by a written act of pledge, in violation of the criminad laws of the state,
 
 to wit, Act 192 of 1908, which makes it a misdemeanor, and punishes with fine and imprisonment any person who has pledged his crops, and who sells or otherwise disposes of same without the written consent of the pledgee.
 

 Section 1 of Act 211 of 1908 is to the effect:
 

 “That whenever the lessor leases land to the lessee for part of the crop, that portion or part of the crop or crops agreed upon by both parties to the contract, which the lessor shall receive, shall be and is hereby declared to be at any and all times
 
 the property of the lessor.”
 

 Section 2 of said act makes it a misdemeanor for the lessee to sell or otherwise dispose of the portion or part of the crop belonging to the lessor.
 

 Act 100 of 1906 provides:
 

 “That the growing crops of the lessee for the current year under -a lease, recorded or unrecorded, cannot be held to pay an ordinary debt of the landowner, or any mortgage whether judicial or conventional, which may have been recorded after the date of the lease.”
 

 It is clear, from the provisions of the acts above cited, that, where the lessor leases land to tenants under a share contract, the crops made belong to the lessor and to the tenants, respectively, in the proportion fixed by the contract between the parties.
 

 The defendant, in the present case, leased his plantation during the year 1924 to tenants on the share system, or for one-fourth, of the cotton produced. It is evident, therefore, that, after paying advances and settling with the landlord for his one-fourth of the crop, the tenants had the undoubted right to take their part of the crop off and sell it, or to sell it in the field. Young v. Gay, 41 La. Ann. 764, 6 So. 608.
 

 In section 17 (c) of Act 57 of 1922, it is declared that:
 

 “In any action upon any marketing contract , of any member with any association existing hereunder,
 
 it shall be conclusively presumed,
 
 that the products produced by any person, firm or corporation during the period of time covered by such marketing contract, on the land of such member,
 
 however and by whomsoever produced, are the products of such member, and
 
 as such, are
 
 subject to the said marketing contract,
 
 if the said products have been grown or acquired
 
 under any contract between such member and such other person, firm, or corporation, entered into after the execution of the said marketing contract; and in such actions, the foregoing remedies for nondelivery or breach shall lie and be enforceable against such persons, firms or corporation.”
 

 Section 19 (a) of said act provides that:
 

 “Any provisions of law which are in conflict with this act, shall be construed as not applying to the association herein provided for."
 

 The Legislature, in drafting this act, has wisely, if not advisedly, provided in section 27 that:
 

 “If any section of this act shall be declared unconstitutional for any reason, the remainder of this act shall not be affected thereby.”
 

 Section 1 of article 14 of the Constitution of the United States provides that:
 

 “No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law.”
 

 In declaring, in section 17 (c) of Act 57 of 1922, that
 
 “it shall be conclusively presumed, that the products produced by a/ny person,
 
 firm or corporation during the period of time covered by such marketing contract,
 
 on the land of such member, however and by whomsoever produced, are the products of
 
 
 *307
 

 suck member, and as such, are subject to said marketing contract,”
 
 etc., the Legislature of this state has made an indirect but clear attempt to deprive tenants of their property in cotton raised under the share system of contract, without notice of such marketing contract, and without due process of law of any kind. Such provision is therefore unconstitutional, null, and void, as being in contravention of the Fourteenth Amendment to the federal Constitution.
 

 The tenants of defendant are third persons as to this marketing contract, entered into by and between defendant and plaintiff, Association, and the record is barren of evi-'' dence to show that these tenants had any knowledge of the marketing agreement of their landlord with said Association.
 

 The Legislature of this state is powerless to make these tenants parties to such contract by mere compulsion, and to subject them “to the remedies” provided in said act “for nondelivery or breach” of the marketing ■ contract in this case, as it has attempted to’ do in section 17 (c) of said act.
 

 These particular clauses in said section of said act are also unconstitutional, null, and void, as being a patent invasion by the Legislature of this state of the constitutional' right to liberty of contract, secured to the tenants of defendant under the Fourteenth Amendment to the Constitution of the United States.
 

 In addition to this, the clauses in question are also amenable to the objection that they operate as a denial to the tenants of defendant, and to the tenants of other members of plaintiff, Association, of the equal protection of the laws of this state, in that, while the tenants of landlords who are not members of plaintiff, Association, are given perfect freedom to contract under the share system and to dispose of their cotton as they see fit and are fully protected under the laws of $iis state, in so doing, the tenants of the members of plaintiff, Association, are denied absolutely such right, although they are not parties1 to the marketing contract, and may cultivate crops on the land of a member of plaintiff, Association, in perfect good faith and without knowledge of the marketing agreement.
 

 Act 57 of 1922 is, in no proper sense of that term, a police regulation, enacted for the protection of the public health, morals, safety, or general welfare.
 

 Its sole purpose is to confer upon a special class of associations the power to make contracts for the exclusive benefit of their members, in order to secure the advantageous disposal of property of a particular kind.
 

 The Legislature, in passing this statute, did not act, therefore, in the legitimate exertion of its police powers for the protection of the general welfare; nor can the discriminations made'in said act be accepted, in a constitutional sense, as classifications based on reasonable grounds in attaining the desired object of such legislation.
 

 It is true that the doctrine of equitable estoppel has been applied in other states of the Union to the effect that the right of co-operative associations to demand the delivery of crops under their marketing agreement will be enforced both against mortgagees and tenants with notice of such agreement, or with knowledge that the landlord is a member of such association. Feagain v. Dark Tobacco Growers’ Co-operative Association, 202 Ky. 801, 261 S. W. 607; Kansas Wheat Growers’ Ass’n v. Ast et al., 118 Kan. 247, 234
 
 P.
 
 963; Oregon Growers’ Co-operative Ass’n v. Lentz, 107 Or. 561, 212 P. 811; Dark Tobacco Growers’ Co-operative Ass’n v. Dunn, 150 Tenn. 614, 266 S. W. 308.
 

 These decisions, with one exception, bind the tenant and mortgagee with notice. Under the laws of this state, however, the landlord has no legal control over the portion of the crop falling to his tenants working under share contracts, as the tenant and the landlord stand upon equal footing as to owner
 
 *309
 
 ship in the crop produced. The tenant, as well as the landlord, is equally master as to his interest, and may sell or otherwise dispose of the same, after paying his advances and delivering to the landlord his part of the crop.
 

 The tenant does not stand in the shoes of the landlord in this state merely because he might have notice that the landlord is a member of a co-operative association, or might have knowledge of the marketing agreement entered into by his landlord with such association.
 

 Section 6 (a) of Act
 
 57 oí
 
 1922 recognizes that lessees and tenants, as well as lessors and landlords, “who receive as rent all or part of the crop raised on the leased premises,” may be admitted as members of co-operative associations in this state.
 

 That the admission into such associations of tenants and lessees receiving a part of the crop under share contracts is as necessary as the admission of landlords and lessors in such cases, in order that such associations may control crops raised under the share system of contract in this state, is a self-evident proposition. It might as well be contended that if share tenants should join a co-operative association in this state, that the landlord or lessor, with knowledge of that fact, could be compelled to ship to such association his fourth of the crop produced, although he had not become a member and did not desire to do so.
 

 Under the laws of this state, pledges, with reference to each other, rank in “the order of recordation,” but after the privileges of the laborer, the lessor, and the overseer. The recorded pledge of the furnisher of money and supplies primes all unrecorded and all subsequently recorded privileges of such furnishers. Civ. Code, art. 3217; Act 66 of 1874, § 1; Act 44 of 1882; Act 89 of 1886; Maxwell-Terger Co. v. Rogan, 125 La. 2, 51 So. 48.
 

 Necessarily, the pledge of the Tallulah State Bank,
 
 recorded
 
 in this case, primes the
 
 unrecorded
 
 marketing agreement of plaintiff Association, with defendant, as to the right of possession of the cotton pledged, as the pledgee, under section 1 of Act 66 of 1874, is deemed by law to be in
 
 possession to
 
 all legal intent and purpose.
 

 Section 16 of Act 57 of 1922 expressly provides that:
 

 “If they contract a sale to the association, it shall be conclusively held
 
 that the title to the products passes
 
 absolutely and unreservedly,
 
 except for recorded liens,
 
 to the association
 
 upon delivery."
 

 In other words, where the lien is recorded, the association receiving the cotton is bound by the same. A recorded lien, therefore, cannot be disregarded by .the association under the pretext that the holder of the lien acted in bad faith, because of the fact that he was aware of the marketing agreement at the time of recordation of such lien, as no such provision or exception is contained in the statute.
 

 On the contrary, the clear intent of the statute is to protect all recorded liens on cotton which may be delivered to the association by its members.
 

 Defendant contends, as to himself, a party to this contract, that said contract is impossible of fulfillment, as it compels him to dispose of property that he does not own; i. e., to sell and deliver, under the marketing agreement, to plaintiff, Association, the undivided interest of his tenants in cotton raised on his plantation in the year -1924 and successive years.
 

 The obligation of defendant is “to sell and deliver to the Association
 
 all
 
 of the cotton
 
 produced or acquired by or for him,
 
 in Louisiana during the years 1923, 1924, 1925, 1926, and 1927.” See Marketing Agreement, section 2.
 

 We have already held in this opinion that paragraph (c) of section 17 of Act 57 of 1922, declaring it to be
 
 “conclusively pre
 
 
 *311
 

 sumen
 
 that the products produced by any person * * * on the land of such member, however and by whomsoever produced,
 
 cure the products of such member,"
 
 etc., is unconstitutional,-null, and void.
 

 Under the laws of this state, products produced upon the land of the landlord, under a share contract, belong, in the proportion agreed upon, to the landlord and the tenants. The marketing agreement in this ease cannot be enforced against defendant as far as the sale and delivery to plaintiff, Association, of the undivided three-fourths interests of defendant’s tenants in the cotton included in said agreement, as, under article 2452 of the Civil Code of this state, “The sale of a thing belonging to another person is null.”
 

 Nor can the marketing agreement be enforced against defendant, under the facts of this case, as to his interest in the crop of 1924, for the following reasons:
 

 (1) Defendant’s crop for the year 1924 was subject to a duly recorded pledge, under Act 66 of 1874, in favor of the Tallulah State Bank for the sum of $4,500, and $5,000 were due by defendant to his tenants for their share of the cotton.
 

 Plaintiff, Association, before making demand for the delivery of the cotton, made no offer whatever to the Tallulah State Bank to pay the amount of this recorded pledge, which affected, of course, the entire crop. The president of said bank was not willing for the defendant to deliver the cotton covered by the pledge to plaintiff, Association, without the bank being paid in advance.
 

 Section 1 of Act 192 of 1908 provides:
 

 “That it is hereby declared to be a misdemean- or for any person who, as pledgor, shall have pledged crops of cotton, sugar or other agricultural products, to another, under the provisions of Act No. 66 of the General Assembly of the state of Louisiana, * * * for the year 1874, and of the amendments thereto, to sell or otherwise dispose of said crops, or any part thereof, with the intention to deprive the pledgee of his pledge thereon,
 
 unless said pledgee shall have given his written consent to sueh disposal of said crops.
 

 “Section 2. Be it further enacted, etc., that whoever shall violate the provisions of this act shall, upon conviction, be fined not more than one thousand dollars, or imprisoned in the parish jail for not more than six months, or both, at the discretion of the court.”
 

 Had defendant attempted to ship this cotton to plaintiff, Association, without the written consent of the bank, his entire crop would have been seized, and, in addition to this, he could have been subjected to a criminal prosecution under Act 192 of 1908.
 

 Recorded liens are binding upon plaintiff, Association, by the express provisions of section 16 of Act 57 of 1922.
 

 Plaintiff, however, attacks the recorded pledge in this case under the authority of the decision of this court in Adler & Co. v. Haas & Co., 134 La. 622, 64 So. 490, on the ground that defendant is not a farmer, and therefore he was without right to borrow money and pledge his crops, under Act 66 of T874, for money advanced to him by the Tallulah State Bank to enable his share tenants to raise the crop of cotton in the year 1924.
 

 This contention is untenable, to say the least of it, when in this very case the marketing contract and the allegations of plaintiff’s petition are all to the effect that defendant is a member of plaintiff, “Cotton Growers’ Co-operative Association”; that he is a cotton grower; that he signed the marketing agreement in this case for the sale of all cotton produced by him on his plantation during the years 1923, 1924, 1925, 1926, and 1927, but has failed to deliver to plaintiff, Association, 150 bales of cotton raised by him during the year 1924.
 

 In addition to this, plaintiff, Association, has cited in its briefs and has insisted upon the
 
 “conclusive presumption,"
 
 contained in section 17 (c) of Act 57 of 1922 that the products produced by defendant on his land dur
 
 *313
 
 ing the year 1924, as a member of the association,
 
 “are the products of such member.”
 

 If the owner of a plantation, who is a farmer, cannot legally pledge the crop worked by share tenants, or tenants paying money rental, then Act 66 of 1874 is a piece of vain legislation.
 

 In the Adler Case the pledgor was not a planter or farmer, but a merchant, who made advances to tenants on a plantation, and gave a pledge to a New Orleans mercantile lirm on the crop for advances made by said firm to him. It was held that no right of pledge or pawn exists, or can be created by contract, in favor of a merchant who lends his money to another in order that the latter may lend or advance it to a planter or farmer for the making of a crop. It was stated in the Adler Case that the pledgor had no mandate from those who did produce the cotton to pledge or pawn it for money obtained by him under a contract to which they were not parties, and of the terms of which they were ignorant.
 

 Defendant in the instant case is the owner of the plantation upon which the cotton was raised, is a farmer, and testified that for the year 1924 he entered into contracts with his tenants for one-fourth of the crop, and agreed to advance them the necessary supplies to make the crop for that year.
 

 The Adler Case clearly has no application to the case at bar, and the pledge recorded in this case by the Tallulah State Bank is therefore valid and binding as to plaintiff, Association.
 

 It is provided in the marketing agreement in this case that:
 

 “If you have a crop mortgage, that cotton does not have to go to the association if you cannot control it.
 

 “Section 3. The grower expressly warrants that he has not heretofore contracted to sell, market or deliver any of his said cotton to any person, firm or corporation, except as noted at the end of this agreement. Any cotton covered by such existing contracts or crop mortgage shall be excluded from the terms hereof for the period and to the extent noted,
 
 if the lien or contract holder so enforces his right to possession.
 

 “You may make a crop mortgage; the association will try to help you secure standard terms.” Section 13 (c).
 

 “If the grower places a crop mortgage upon any of his crops during the term hereof,
 
 the association shall have the right to take delivery of his cotton and to pay off all or a part of the crop mortgage for the account of the grotoer and to charge the same against him individually.
 

 “The grower may place a crop mortgage upon his cotton; and agrees to notify the association prior to making any crop mortgage; and the association will advise the grower in any such transaction.”
 

 Plaintiff, Association, may pay off all recorded crop liens or pledges
 
 before
 
 delivery of the cotton to it, but said Association is without the slightest right or authority, under the laws of this state, to demand delivery of a crop covered by a recorded pledge, without prior payment of the debt, or without the written consent of the pledgee, as delivery by the pledgor otherwise constitutes a grave criminal offense upon his part under Act 192 of 1908.
 

 The enforcement of the marketing contract, as to the defendant, under the circumstances of this case, is therefore not legally possible, as such enforcement would require the commission by defendant of a crime.
 

 “Every condition of a thing impossible, contra bonos mores (repugnant to moral conduct), or prohibited by law, is null, and renders void the agreement which depends on it.” R. O. O. art. 2031.
 

 Plaintiff, Association, does not advance money or supplies to its members for the purpose of raising crops in the state of Louisiana, but only on cotton delivered, and then only such percentage of the value of the cotton as it may determine.
 

 While the initial advance is made immediately upon the delivery of the cotton, it appears from the testimony of Mr. Walter Scott, a'member of the Association; that full
 
 *315
 
 or final returns are not made by tbe Association until a period between June and August of tbe following year.
 

 It is idle to speak of the right of a member of the Association to draw drafts against cotton delivered, or to assign to his creditor his equity in cotton shipped, to the Association, when such member is powerless, under the laws of this state, to deliver to the Association cotton covered by a recorded pledge, unless upon the payment of the debt before delivery, or with the written consent of the pledgee. Even had it been legally possible for defendant to have delivered his whole crop to plaintiff, Association, in October, 1924, he would have received, as an initial payment, upon delivery, the sum of $7,602.-75, according to the testimony in the case, while it was necessary for him to have the sum of $9,500 in order to liquidate his debt to the Tallulah State Bank, of $4,500, secured by recorded pledge, and to pay to his tenants their part of the crops, amounting to the additional sum of $5,000.
 

 As defendant offered, before the institution of this suit, to deliver to plaintiff, Association, some 12 or 15 bales of cotton which he could control, and, as it was not legally possible for him to do more, the temporary restraining order herein issued was properly recalled, annulled, and vacated, the application for a preliminary injunction was properly rejected and denied, and the rule nisi recalled and discharged.
 

 Judgment affirmed.
 

 O’NIE-LL, C. J.,
 

 is of the opinion that the rights of the parties in interest in the cotton raised on the defendant’s farm, that is to say, the plaintiff, the defendant, the latter’s tenants, and the Tallulah State Bank, as pledgee, are governed by the laws of registry, and that, if the marketing agreement sued on was not recorded when the defendant’s tenants and the pledgee acquired their claims upon the cotton crop, their claims must be respected by the plaintiff; but the Chief Justice does not concur in the majority opinion that the marketing contract, or Act 57 of 1922, authorizing such contracts, is violative of either the due process clause or the equal protection clause of the Fourteenth Amendment.