### BOWLES v. AMERICAN RICE GROWERS' COOPERATIVE ASS'N.

Civ. A. No. 1633.

District Court, W. D. Louisiana, Lake Charles Division.

Nov. 20, 1945.

---

490

Girard J. Fernandez, Food Enforcement Atty., Office of Price Administration, of New Orleans, La., for plaintiff.

Jones, Kimball & Owen, of Lake Charles, for defendant.

PORTERIE, District Judge.

The opinion of the Court being oral, there will be no attempt to separate the statement of facts from the conclusions of law. Both of these will be intermixed.

The two main elements dominating the case are:

A. From the whole evidence of the case we gather that the rice market is a seller's market, in particular this last season, that the producer was invariably asking for the ceiling price, and the buying mill was willing to pay it. And for that reason, the Court must see that the ceiling price be not violated, for that would be a break which would permit the price of rice to skyrocket—the very point that the OPA regulations are to prevent.

B. What is the ceiling price for early prolific rice? Our answer is $5.60 per barrel for that type of rice containing no more than 17% of water.

The evidence has shown and it is mutually granted that the moisture content of the 376.04 barrels of Early Prolific rice sold was 13.8%. The evidence has shown, and we don't think there is any debate on the point, that the Liberty Mill bought the rice for a total sum of $2,199.83; that it was acceptable to the buyer and the seller.

There was a total cost for drying of $244.60. Of this amount Williams, the seller, has paid $150.59 for the reduction of the moisture of the rice from 25% to 17%, and the amount left to pay for drying, $94.01, was paid by the Liberty Mill, the buyer, to bring the rice to a moisture of 13.8%.

It is the Court's opinion that the ceiling price of this particular type of rice is $5.60 per barrel, less the amount per barrel necessary for drying charges to reduce the moisture content to 17%.

The miller has paid $94.01 of the drying cost for the further reduction of the moisture from the 17% to the 13.8%, which item the Government alleges is a violation of the OPA regulations.

The moisture of rice probably must be reduced below 17% to prevent loss from mildew and heat in its transportation from the producing area, Southwest Louisiana, to the mills.

Basically, the evidence of the case proves that the drying of rice is a milling process, and is not the function of the producer. The producer is through when he moves the rice away from the agricultural premises where it has been grown.

The 17% specification in the OPA regulation makes the drying of combined rough rice a cost to be properly divided between the producer and the buying mill. We mean here that the reduction of the humidity to the 17% ceiling price specification should be borne by the producer, and the reduction of the moisture from the 17% to whichever per cent the buying mill prefers for safe transportation should be borne by the buying mill. The OPA regulations are silent on who is to bear the drying charges.

Coming back to the specific facts of the case, it appears that there was a meeting of minds on the 14th of August, 1945, when Mr. Barnett, representing the Liberty Rice Mill, the plaintiff in this case, made an agreement with Mr. Shipp, the secretary of the Cooperative Association, whose duty was to represent the interest of the seller.

We believe that the evidence discloses that the producer of this Early Prolific rice through his cooperative was bent on receiving the ceiling price established for the particular rice he had to sell. It has been evident from Mr. Barnett of the Liberty Mill that his mill was willing to pay the ceiling price. This willingness of the Liberty Mill is much to its credit, and I am not condemning this, for I think Mr. Barnett is desirous of having this case adjudicated so that he may know how to proceed in the future.

It is the clear opinion of the Court that the minds met on the sale of this rice at $5.60 per barrel with no more than 17% moisture content. From the documents submitted, from the affidavits and the oral

statements of the witnesses, corroborated by everyone, the rice producers sold at the ceiling price.

■ Also, the general practice of rice dealers is that before the rice is harvested, there are many sales made as in this case. Such meeting of the minds is permitted by law. See Article 2450, Louisiana Civil Code; Penick & Ford v. Waguespack & Haydel, 148 La. 39, 86 So. 605.

When the meeting of the minds occurred, a contract was born subject to certain future conditions. When that agreement occurs, whether or not in fact there is a title actually passing then, the fact that the minds met is sufficient.

There was unquestionably a passing of title at the time that there was a 17% moisture content, whether the rice was actually weighed then or not.

The Court believes that it would be an injustice if it were to rule differently than what it now rules. The selling was at the ceiling price, and we believe it was clearly the understanding between the two parties that the buyer would be compelled to pay the $94.01, or to give the miller 29.92 barrels of rice which is the volumetric loss of the rice when it was reduced from 17% moisture content to 13.8%.

We believe this was such a case by actual agreement, contract and settlement.

The evidence in this case is that the method of settlement followed enables the miller to operate economically and at a profit such that he has not to pass any burden to the buyer from him. In other words, there is no pressure to cause inflation.

The OPA officials did well to set this case for determination, for it is quite evident that after the completion of this case the rules and regulations will have been interpreted so as to leave the trade, selling and buying, in an informed position.

On the point of field drying, it might be said that it is extraneous to the case. But on this phase of field drying, a point was brought out by Captain Plunket, one of the expert witnesses: the moisture may dry out of the rice in the field shock without expense. Fortuitously, the rice may come down to a moisture of 15 or 16% in the field. That is not disputed.

In answer to Mr. Fernandez, OPA counsel in this case, that rice in some cases in the field will be reduced to less than a 17% moisture and yet the farmer will get no more than $5.60, we reply that, in this case put by counsel, where you cannot ask an amount of money for artificial drying, the farmer should be given a bonus above the $5.60, represented by the cost of what the artificial drying would be for reducing the moisture below the 17%. Nature sends you no bill; the artificial dryer does. Nevertheless, the farmer should receive pay for Nature's boon.

We wish to thank the counsel on both sides. The case was well presented, meticulously prepared, and counsel on each side was worthy of the other.

The lid is not off by any means by this ruling. The margin that the Government urges in this case is only an alleged net overcharge of $94.01 in a transaction involving a total sum of $2,199.83.

Driers are beyond the producer's ability to erect in the Southwest Louisiana area. Rice farms here are relatively small, and individually owned. There is no single farmer rich enough in the area, even since the combined method of harvesting, to have put up a drier on his premises, nor is there even such an erection in prospect.

The miller, or warehouseman, must have the driers, since the combined method of harvesting rice is decidedly prevalent.

I am giving only a partial marshalling of the facts, and from these above enumerated, and from the conclusions of law drawn from these facts, and because of other facts in the record not specifically mentioned herein, my ruling is that the injunctions sought, preliminary and permanent, are denied.

The Court has been impressed with the sincerity and good faith of both sides. The Court thinks this litigation is a good thing. It will prove profitable, especially in the future. We have been impressed with the sincerity of Mr. Barnett. He has just wanted to know what the law is with these facts. We do not think the Liberty Mill should be penalized in the

future by the producers. We think business should be had with the Liberty because we think they have brought something here that will be profitable to the producer. We think there should be co-operation with all the mills to which rice is sold, on the one hand, and on the other hand also with the OPA. The interpretation of the rule was simply needed. It is not contrary to business and has brought good results.