BOLIN FARMS et al.

v.

AMERICAN COTTON SHIPPERS AS-
SOCIATION et al.

Lee Lois JONES, Individually and in be-
half of that Class of Sharecropper Cot-
ton Farmers Similarly Situated

v.

ALLENBURG COTTON COMPANY,
INC., Individually and all other Cotton
Shippers, Merchants and/or Mills which
have Contracted to Purchase Cotton
From the Class of Plaintiffs.

Johnnie KOVAC, Jr.

v.

GEORGE H. McFADDIN & BROS., et al.

BOLIN FARMS

v.

W. H. KENNEDY & SON, INC., et al.

Donald GLOSUP et al.

v.

COOK INDUSTRIES, INC., et al.

Homer McDANIEL et al.

v.

W. H. KENNEDY & SON, INC., et al.

George TAYLOR

v.

CONE MILLS CORPORATION.

Civ. A. Nos. 19351, 19389, 19365, 19364,
19418, 19485 and 19652.

United States District Court,
W. D. Louisiana,
Monroe Division.

Jan. 31, 1974.

Kidd, Katz & Halpin, Monroe, La., for plaintiffs.

Snellings, Breard, Sartor, Shafto & Inabnett, Monroe, La., Theus, Grisham, Davis & Leigh, Monroe, La., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., Massey & Robinson, West Monroe, La., for defendants.

EDWIN F. HUNTER, Jr., Chief Judge:

As of January 3, 1974, the writer assumed jurisdiction. These cases had

previously been handled by the Honorable Ben C. Dawkins, Jr. A five-page order was entered on January 3, 1974; following a lengthy conference with counsel.

The pending motions have been submitted *on the transcript of hearings held before Judge Dawkins, a multitude of depositions, and various affidavits.*

### CIVIL ACTION 19502

The motion to dismiss, pegged on lack of diversity, has been sustained and a judgment signed. My understanding is that both sides concede dismissal to be correct.

### CIVIL ACTION 19485

■ Defendants in this $665,000,000 anti-trust suit filed a motion to stay, insisting that judgment in the contract cases favorable to plaintiffs is an essential prerequisite to a day in court in the anti-trust suit. We intimate no opinion as to the validity of this contention. We do grant a stay of all further proceedings for the time being, with the exception of the pending motion by plaintiffs for a preliminary injunction. Judge Dawkins granted a temporary restraining order, but, by order of November 1, 1973, dissolved the TRO and cancelled the hearing on the preliminary injunction that had been scheduled for November 19, 1973. Writs of mandamus and prohibition were lodged in the Fifth Circuit Court of Appeals. That Court, on November 19, 1973, denied the writ. Plaintiffs would enjoin the defendant "cotton buyers" from:

1. Requiring any farmer to sign the so-called Confirmation of Sale statement which would reveal whether or not his cotton had been previously contracted for.

2. Using any of the catalogs prepared by American Cotton Shippers Association in determining whether to purchase cotton or not.

3. Using any kind of criterion in the purchase of cotton, except technical data that was not employed prior to 1973, and

4. Refusing to purchase cotton from farmers who signed 1973 cotton contracts on any different basis or price than that made or paid to cotton farmers or producers who did not sign contracts for 1973.

The circumstances in which a preliminary injunction may be granted are not prescribed by the federal rules. The grant or denial often remains a matter for the trial court's discretion and must be exercised in conformity with historic equity practice. We cannot say, as a matter of equity, that a cotton buyer cannot require a statement from a prospective seller that he has not previously contracted for the sale of his cotton. We are not prepared to prohibit cotton buyers from utilizing trade catalogs to ascertain whether or not a prospective seller has sold to someone else. Plaintiffs' motion for a preliminary injunction is denied.

This anti-trust action is severed for separate consideration. This severance is necessary to avoid possible prejudice and to expedite resolution of the contract cases.

### THE CONTRACT CASES—19,351, 19,389, 19,365, 19,364, 19,418

This litigation arises out of the attempts by eleven (11) cotton farmers to test the contracts by which they concededly obligated themselves to sell and deliver their cotton. In essence, defendants agreed to purchase whatever was planted by these farmers on specific acreage at a price agreed upon between January and March of 1973, irrespective of what the price might be at harvest time. Meanwhile, the price of cotton unexpectedly skyrocketed to at least double the price agreed upon. The complaints seek a declaration that the contracts are null and void, so that plaintiffs may achieve a better price than they bargained for. The fundamental question in each action involves the enforceability *vel non* of contracts for the

advance or forward sale of cotton grown for the 1973 crop.

## CLASS ACTION REQUEST

█ Plaintiffs seek to maintain these contracts as consolidated class litigation on behalf of "all cotton farmers in the State of Louisiana that have signed 'forward' or 'future' crop contracts with cotton brokers and/or buyers." (Plaintiffs' motion, page 1.) This description would, of course, encompass a highly diverse aggregation of purported class members, many of whom may be persons who never had dealings with defendants. The individual petitions make no reference to any purported class, and all allegations are asserted on behalf of individual plaintiffs. As the Court of Appeals for the Fifth Circuit made clear in Danner v. Phillips Petroleum Co., 447 F.2d 159, 164 (5th Cir. 1971), complaints such as these cannot possibly provide an adequate predicate for class action certification.

Even more significant, plaintiffs have not made the slightest factual showing that the weakening of the forward contracting system which this purported class litigation seeks would be welcomed by, or would in any way benefit, all members of the purported class. On the contrary, it is apparent that plaintiffs' interests are antagonistic to, rather than typical of, many members of the purported class. Surely, a person who has attempted to test his contract and has incurred counterclaims thereby can in no sense be regarded as "typical" or adequately representative of a class of persons who have not attempted to repudiate their contracts. This inescapable divergence between plaintiffs' position and class members' positions is even more pronounced in the case of those class members who have already delivered and been paid.

In Arnesen v. Raymond Lee Organization, Inc., 59 F.R.D. 145, 148 (C.D.Cal. 1973), as in the case at bar, a plaintiff who was "seeking a rescission of his agreement" with defendants sought to represent a class composed of other persons who had entered into agreements with defendants but had not purported to rescind their agreements. The Court held that because of plaintiff's attempted rescission, plaintiff was in a "different posture" from that of other class members, and thus:

> "Plaintiff's claim against defendants is not typical of claims of other members of the class, Rule 23(a)(3) * * *." 59 F.R.D. at 148.

We conclude that the maintenance of plaintiffs' class pursuant to Rule 23 would be improper, and the motion for a determination of the same is denied.

## THE MOTIONS

The record is a morass of pleadings which can best be unraveled by proceeding to the very core of the case—that is, the validity and enforceability of a contract for the purchase and sale of cotton, entered into between a willing buyer and a willing seller, both adult (experienced cotton farmers on the one hand and experienced cotton buyers on the other hand) on an open and competitive market. The case on summary judgment presents two facets:[1]

(1) The prayer of plaintiffs for a declaratory judgment annulling the cotton sales contracts, and

(2) The prayer of defendants that the contracts be adjudged lawful and valid.

On these motions, we have before us:

1. The depositions of 25 individuals;

2. Affidavits filed by defendants prior to January 3, 1974, and the affidavit filed by Mr. Kidd as per this Court's instructions, and

3. The transcript of the proceedings before the Honorable Ben C. Dawkins, Jr. on November 26 and 27, 1973, and December 5, 1973. This transcript includes the testi-

---

1. Defendants' counterclaims were filed on October 24, 1973; the motion for summary judgment on November 8, 1973.

**1358**

mony, under cross examination, of some 20 individuals.

An opening article of the Law of Obligations (Louisiana Civil Code Article 1901) reads:

"Agreements legally entered into have the effect of laws on those who have formed them.

"They cannot be revoked, unless by mutual consent of the parties, or for causes acknowledged by law.

"*They must be performed with good faith.*"

This statutory mandate has stood unaltered from Article 1134 of the Code Napoleon through the Louisiana Codes of 1808, 1825 and 1870.

It is a matter of public record and public knowledge that as a result of the sudden and spectacular rise in the price of cotton in the latter part of 1973, literally scores of suits have been filed, either to enforce or rescind these advance or forward contracts. Defendants have cited thirteen (13) cases that arose between September 18 and November 9, 1973. In each, the validity of the contracts has been upheld by either summary judgment, declaratory judgment, preliminary injunction, and/or permanent injunction. These affirmations of the contracts have emanated from the United States District Courts for the Middle District of Georgia, the Northern District of Mississippi, the Western District of Tennessee, the Northern District of Alabama, The District of South Carolina, the Northern District of Georgia, and from the state courts of Arkansas, Georgia, Alabama and Mississippi.[2]

Jurisdiction is pegged on diversity. We are governed by Louisiana law.[3]

The contracts are in evidence. They speak for themselves. No useful purpose would be served by detailing each provision. They were entered into between January 9, 1973 and March 29, 1973. In each, plaintiffs obligated themselves to sell and deliver to the defendant cotton buyers all of the cotton raised and harvested on designated acreage. The price ranged from 29¢ to 41¢ per pound. The actual cotton produced was physically to be delivered to the buyers, to be by them physically received and paid for on delivery. These contracts were negotiated prior to planting. We call them "forward" sales contracts. Each plaintiff cotton farmer was experienced, having been a cotton producer for several years, and each was familiar with the forward sale contract procedure.

The depositions reveal that during the period of time from January 9th through March 29, 1973, the competitive open market range ran from 28¢ to 32¢ per pound. On the basis of the record it would be difficult to quarrel with the proposition that the sales were for a fair market price at the time they were made, and as a matter of law we con-

---

2. R. N. Kelly Cotton Merchant, Inc. v. Kenneth York, et al., C.A.No.861 (U.S.D.C., M.D.Ga.); J. L. McIntyre & Sons, Inc. v. Hart Cotton Company, Inc., No. 43,006, Oct. 18, 1973, Jefferson Cty., Ark.; Mitchell-Huntley Cotton Co., Inc. v. Fulton Benson, et al., C.A. 2902 (U.S.D.C., M.D.Ga., Sept. 18, 1973); Cherry Cotton Co. v. Morgan, C.A. EC73-91S (U.S.C.S., N.D., Miss., Oct. 23, 1973); Cone Mills Corp. v. A. H. Carpenter, et al., C.A. 73-416 (U.S.D.C., W.D.Tenn., Oct. 19, 1973); Mitchell-Huntley Cotton Co., Inc. v. A. C. Walker, et al., CA 73-G-917, Oct. 2, 1973 (U.S.D.C., N.D.Ala.); Mitchell-Huntley Cotton Co., Inc. v. Earl Waldrep, et al., CA 73G-916, Oct. 5, 1973 (U.S.D.C., N.D.Ala.); Mitchell-Huntley Cotton Co., Inc. v. Curtis Stroup, CA 73-L-956, Oct. 12, 1973 (U.S.D.C., N.D.Ala.); West Point-Pepperell, Inc. v. Jack Fears, et al., CA 7060 (Sup.Ct., Henry County, Ga.); Pell Cotton Company v. I. Byrd Parnell, et al., CA 73-1170 (U.S.D.C., S.C., Oct. 4, 1973); Charles T. Cox, Jr. v. Mt. Vernon Mills, Inc., et al., CA 15083, Oct. 8, 1973 (Cir.Ct., Talladega Cty., Ala.); J. M. Montgomery, Jr., et al. v. W. E. Austin, CA 15757, Aug. 21, 1973 (Sunflower Cty., Miss.); Cone Mills Corp. v. A. G. Estes, Inc., et al., CA 1129, Oct. 26, 1973 (U.S.D.C., N.D. Ga.); Cone Mills Corp. v. Hurdle et al., 369 F.Supp. 426 (U.S.D.C., N.D.Miss.1973); Plains Cotton Cooperative Assn. v. W. C. Bowman, CA 5-1222, Oct. 30, 1973 (U.S.D. C., N.D.Tex.).

3. Discussed, infra.

clude that the price and circumstances prevailing at the time are determinative.

From April through September, the cotton market rose spectacularly. The price of 29¢ or 30¢ a pound, which looked so good to the farmers in February, no longer looked so good against 80¢ in September.

These farmers certainly have every right to contest the validity of their contracts. Likewise, the buyer has every right to assert the validity of their bargain. To quote the Honorable Wilbur D. Owens, Jr., U. S. District Judge, Middle District of Georgia (see Mitchell-Huntley Cotton Co. v. Fulton Benson, Civil Action 2902):

> "Ladies and Gentlemen, this case illustrates about as well as any case that will ever be in a court room that life is a two way street, that when we make bargains that turn out to be good for us that we keep them and then when we make bargains that turn out to be bad for us that we also keep them. That seems to be the essence of what this case is about.

> "The defendants, naturally, don't want to sell cotton because the price has gone up and if I were one of those defendants I would feel the same way. I would be sick as an old hound dog who ate a rotten skunk, but unfortunately—well, not unfortunately—fortunately we all abide by contracts and that (is) the foundation of which all of the business that you have heard about here today is done."

What caused the upward price spiral of April to September? There were many causes. We are unable to pin down any one. Be that as it may, the cause has no relevance to the validity of the contracts. Some of the deponents point to such factors as large export shipments to China, high water and flood conditions in the cotton belt; late plantings forced by heavy rains, and the devaluation of the dollar. These elements and others are reasonable causes, but whatever causes the market to go up and down after the date of a contract has no relevancy to its validity. One facet of plaintiffs' attack is that the cotton buyers had inside information at the time they contracted with plaintiffs, and that these factors would coincide and drive the price of cotton to the level that it had never before reached. The record does not reveal this to be true. The record will reveal that Dallas Thomason sold his cotton at 30¢; Frank Jones, Jr., Executive Vice-President of Cook Industries, Inc., sold his cotton at 30¢; Conner Morscheimer, cotton buyer for W. K. Kennedy Co., Inc., sold his cotton at 29½¢.

Plaintiffs emphasize that the cotton farmer has always been at the mercy of the weather and the boll weevil. This may be true, but by firm forward selling, the farmer shifts many of his risks to the buyer. The farmer guarantees neither quality nor quantity. He obligates himself to sell and the buyer obligates himself to buy all the cotton the farmer harvests from identifiable acreage. He sells it at a price at which he figures at the time of the contract he can make a profit in relation to his expectable costs. Against that firm contract he can arrange his crop financing. The depositions reveal the system used, and there can be no argument that it does give the grower a very real limitation of risk.

■ Plaintiffs allege that the contracts are unenforcible in the absence of federal excise stamps. This is not so. The Federal Cotton Futures Act, 26 U. S.C.A. §§ 4851–4877, imposes an excise stamp tax on each futures contract, but that Act and the tax imposed are not applicable to sales and purchases of cotton, the physical commodity.

■ Moving quickly to validity, we appreciate that the 13 cases cited are not controlling, but we do find it extremely persuasive that in 13 recent cases attacking the validity, in federal and state courts, all upheld the contracts. Affirming the legality of commodity contracts for future delivery or forward sale contracts where the contracts intend actual delivery of the physical commodi-

ty are Baucom and Kimball v. Garrett Mercantile Co., 188 La. 728, 178 So. 256 (1937) (cotton), and Penick & Ford v. C. Lagarde Co., 146 La. 511, 83 So. 787 (1920) (molasses). It has been consistently held in Louisiana that contracts of this nature are not in any respect contra bonos mores as gambling transactions, but are perfectly valid. Manget Brothers Co. v. Page, 183 So. 139 (La. 2 Cir. 1938—Writ denied) (cotton); Gerde Newman & Co. v. Curcuru, 18 La.App. 572, 139 So. 83 (Orleans App.1932) (eggs); Burke v. Biggers (App.Orleans, 1920), 3 Peltier Reports 525 (cotton); Bibb v. Allen, 149 U.S. 481, 13 S. Ct. 950, 37 L.Ed. 819; Bowles v. American Rice Growers' Co-operative Assn., 66 F.Supp. 489 (W.D.La.1945); Plaquemines Equipment & Machinery Co. v. Ford Motor Co., 245 La. 201, 157 So.2d 884 (1963).

The Louisiana jurisprudence uniformly sustaining validity is firmly founded upon Articles 2450 and 2451 of the Louisiana Civil Code:

> "A sale is sometimes made of a thing to come; as of what shall accrue from an estate, of animals yet unborn, or such like other things, although not yet existing." (2450)

> "It also happens sometimes that an uncertain hope is sold; as the fisher sells a haul of his net before he throws it; and, although he should catch nothing, the sale still exists, because it was the hope that was sold, together with the right to have what might be caught." (2451)

■ Plaintiffs' request in each of these five (5) cases for declaratory judgment annulling the cotton sale is denied; defendants' request that the contracts be adjudged lawful and valid is granted. In arriving at these conclusions, we find:

1. The contracts are not contra bonos mores;

2. The contracts do not permit the unjust enrichment of the defendants;

3. The contracts are not vague; they are capable of a reasonable interpretation;

4. The contracts do demonstrate there was a meeting of the minds between the parties;

5. There was proper consideration for making of the contracts;

6. The item contracted for was not uncertain as a matter of law.

7. There was no lesion beyond moiety, and lesion beyond moiety is not applicable.

8. Defendants did not illegally solicit the contracts;

9. The contracts are not in violation of the Internal Revenue Code, 26 U.S.C. §§ 4851–4877.

## SPECIFIC PERFORMANCE

■■ We describe a promisor's failure to perform his promise as a breach of contract; we do not describe his duty as being in the alternative—that is, to perform or pay damages. The Louisiana Civil Code indicates very strongly that the remedy of specific performance was fully intended by the redactors of the Code:

1. One of the opening articles in the Law of Obligations defines a civil obligation as "a legal tie, which gives the party, with whom it is contracted, the right of enforcing its performance by law." Article 1757(3).

2. Article 1763 mentions both damages and specific performance as available remedies upon the breach of a conventional obligation.

3. Article 1799 declares that it is a presumption of Louisiana law "that in every contract each party has agreed to confer on the other the right of judicially enforcing the performance of the agreement, unless the contrary be expressed, or may be implied."

4. Thus, when one party proposes and the other assents, "then the obligation is complete, and by virtue of the right each has impliedly given to the other, either of them may call for the aid of the law to enforce it." Article 1803.

5. In prescribing the effect of obligations, Article 1901 provides that "[A]greements legally entered into have the effect of laws on those who have formed them * * *. They *must be performed with good faith.*" (Emphasis added).

6. Article 1903 follows by providing that the duty to perform extends not only to the primary obligation, but to everything that is considered incidental to the contract.

7. The Code divides obligations into two classifications, as to their effect: (i) obligations to give, and (ii) obligations to do nor not to do. With regard to specific performance, Article 1907 declares that "[t]he obligation of giving includes that of delivering the thing * * *." Article 1909 further provides that, once the object is specified, the obligation is perfect by mere consent of the parties.

The Articles governing obligations, it is argued, imply that specific performance is only a secondary remedy. Article 1926 reads:

"On the breach of any obligation to do, or not to do, the obligee is entitled either to damages, or, in cases which permit it, to a specific performance of the contract, at his option, or he may require the dissolution of the contract, and in all these cases damages may be given where they have accrued, according to the rules established in the following section."

However, on analysis of the source provisions of this Article, the corresponding French text in the Louisiana Civil Code of 1825 (Article 1920) provides, on translation:

"* * * that one in favor of whom the obligation is contracted has the right either to damages with interest or to specific execution of his contract, at his choice, if that execution is possible." [4]

Article 1927 seems also to weaken the argument for specific performance. But clearly, these articles apply *only* to obligations *to do or not to do.* The contracts at bar are more appropriately considered as contracts *to give,* particularly in light of Article 1905:

"The term to give, in this division of obligations, is applied only to corporeal objects, that may be actually delivered from one to another; and it includes the payment of money as well as the delivery of any other article. A covenant, respecting any corporeal rights comes under the definition of contracts to do or not to do, because some act, besides that of delivery, is necessary for the transfer of such rights."

The Articles governing obligations *to give* present no bar to specific performance as a method of enforcement.

Article 2046 in the section on resolutory conditions declares that there is a resolutory condition implied in *all commutative contracts,* in case one of the parties does not comply with his obligation. If this breach occurs, the contract is not dissolved of right, but the law gives the aggrieved party two choices of remedies: (1) he may sue for the contract's dissolution with damages, or, (2) if the circumstances of the case permit, demand a specific performance.

Title VII of the Louisiana Civil Code deals with sales. These articles, too, indicate the intent of the redactors to provide for specific performance. This remedy found in Article 2458, applies precisely to the contracts at bar,

4. The French version can be found at Comment, Louisiana Law of Specific Performance: Codal Provisions and Methods of Enforcement, 40 Tulane L.Rev. 340, 343 (1966).

for it speaks of the sale of "goods, produce or other objects." This codal provision provides that once the goods are "weighed, counted or measured," the buyer may "require either delivery of them or damages, if there be any, in case of non-execution of the contract."

■ These contracts are not "contracts of sale," but rather, are "contracts to sell." Article 2462 provides for their enforcement:

"A promise to sell, when there exists reciprocal consent of both parties as to the thing, the price and terms, and which, if it relates to immovables, is in writing, so for amounts to a sale, as to give either party the right to enforce specific performance of same."

The article was amended in 1910 so as to read that when there is reciprocal consent, the promise of sale (or contract to sell) "so for amounts to a sale as to give either party the right to enforce specific performance of same." This amendment altered the consequences from those contained in the French codal article. Under the French version, the property would be *acquired* by the buyer giving his consent. The 1910 amendment limited the effect of acceptance in Louisiana to the acquisition of a right to specific performance.[5] While this remedy has been pursued most actively in actions involving *immovable* property, the codal article by no means precludes applicability to a contract to sell *movable* property. As one commentator stated:

"There is nothing in the articles, nor in the writing of the French commentators, to indicate that there should be any difference in treatment between promises and contracts to sell movables and those to sell immovables."[6]

The reference to "immovables" refers to the requirement that there be a writing, and not to the right of a party to enforce by specific performance. Surely, the remedy is available when movable property is involved. While most cases have dealt with contracts to sell immovables, Louisiana courts have granted specific performance as to movables. The Louisiana Court of Appeal (2nd Cir.), in Oliver v. Home Service Ice Co., Inc., 161 So. 766 (1935) considered a contract to purchase and sell ice for a number of years. The seller refused to sell ice in accordance with the contract. The purchaser brought a suit for specific performance of the contract, and the Court granted:

"that a writ of mandatory injunction issue herein ordering, directing, and commanding defendant to abide by the terms of the contract sued on, and *specifically ordering and commanding* it not to increase the price of ice sold to plaintiffs beyond that fixed in said contract." 161 So. at 772.

In Mente & Co., Inc. v. Roane Sugars, Inc., 199 La. 686, 6 So.2d 731 (1942), the Louisiana Supreme Court enforced a contract to purchase paper bags. The Court adopted the written reasons of the trial judge, in saying:

"The law presumes that parties understand the import of their contracts and that they intend that which its terms and conditions manifest. It is axiomatic that parties should be held to the terms of the contract which they accept; they may contract as they please, provided the cause of the contract is lawful, not contrary to public policy or not forbidden by law, moral conduct or public order. [citations omitted]." 6 So.2d at 734.

The Court went on to order:

"that defendant shall have and enjoy the right to demand of plaintiff the delivery of the merchandise so contracted for, such delivery to be made within reasonable times and under the

---

5. Smith, *An Analytical Discussion of the Promise of Sale and Related Subjects, Including Earnest Money*, 29 La.L.Rev. 522, 528–29 (1960).

6. Harrison, *The Effect of Article 2462 of the Louisiana Civil Code*, 3 La.L.Rev. 629, 639 (1941).

terms and conditions of said contract."
6 So.2d at 736.

In Fromherz v. Bruno, 206 So.2d 144 (La.App. 4th Cir. 1968), plaintiffs sought recognition of ownership and right to the possession of eight custom-made dining room chairs under a contract with a cabinet maker. Specific performance was not prayed for, but the remedy granted had the same result. The judgment recognized plaintiffs as owners of the chairs and ordered:

"defendants to surrender and deliver same to plaintiffs and receive the balance of the purchase price in the registry of the court * * *."

There have been many Louisiana decisions involving immovable property recognizing specific performance as the favorable remedy. In Girault v. Feucht, 117 La. 276, 41 So. 572 (1906), the Louisiana Supreme Court granted specific performance of a contract to sell realty, and stated:

"To our mind, if by virtue of a promise of sale equivalent to a sale a man is practically the owner of a certain piece of real estate, and asks the court to enforce his rights, the court would be making but a poor response by giving him damages. What he wants, and has a clear and incontestible right to, is the property itself. To award him mere damages and reject his demand for the property would not be to give him his right, but would be to deny him his right."

Gulf Refining Co. of La. v. Hayne, 148 La. 340, 86 So. 891 (1920), involved a suit for specific performance of an oil lease contract. The Louisiana Supreme Court granted specific performance, reasoning that

" * * * the only reason why the breach of any contract gives rise ordinarily to an action in damages is that ordinarily specific performance cannot be enforced. However, performance being the more complete remedy, there can be no reason why it should not be

allowed in cases where it is available and demanded." 86 So. at 893.

In Sexton v. Waggoner, 66 So.2d 634 (La.App. 2nd Cir. 1953), specific performance of a contract to sell realty was granted. The Court of Appeal followed Hayne, and, in relying on Articles 1926 and 1927 of the Civil Code, stated:

"These articles accord to the obligee upon . breach of the obligation the right to exact damages, or to require the dissolution or specific performance of a contract at his option, with the allowance of damages where such have properly accrued. *Where specific performance is the more complete remedy, it should be permitted in cases where it is available and demanded.*" (emphasis added) 66 So.2d at 639.

See also Gamburg v. City of Alexandria, 85 So.2d 276, 284–285 (La.App. 2nd Cir. 1956). The effects of a. contract to sell were discussed in Choctaw Home Buildings, Inc. v. Lena, Inc., 223 So.2d 23, 28 (La.App. 1st Cir. 1969). The Court stated:

"A promise to sell, when accepted by the prospective purchaser, is analogous to a sale. In such instances the "buyer" acquires a real right tantamount to a sale which entitles him to maintain an action for specific performance of the contract to sell."

In the ordinary case the parties bargain for performance and often fail to even address the consequences of nonperformance. This is not the case here. In 19364, 19365 and 19389, the contracts state:

"Seller * * * guarantees the terms of this contract will be carried out."

In 19351, 19365 and 19418, the Seller agrees to "sell and deliver" the cotton.

This Court, in Pennzoil United Inc. v. City of Monroe (unreported, No. 15801), enforced by injunction against the seller, Pennzoil, specific performance of its contract to sell gas to the City of

Monroe. See also United Carbon Company v. Monroe, 92 F.Supp. 460 (D.C. 1950); 196 F.2d 455 (5th Cir. 1952).

Our conclusion is that plaintiffs' contention that under Louisiana law the rejection of the contract can result merely in compensatory damages cannot square with the language of the Code, the jurisprudence, or the deal of the parties.

If the primary justification for the contract rule is not a principle, it must be a policy: promises are enforceable in order to facilitate commerce. It is the disruption of that flow of commerce which would be caused by breach of these contracts that fundamentally makes the breach irreparable. (Testimony of Shackelford and Lynn in the hearings of November 26–27, and affidavits filed with the motion for summary judgment).

■ The contracts have been held valid. Clearly, given the legality, injunction ordering their performance is the only just and equitable remedy.

The relationship between mandatory injunctions and declaratory judgments in federal actions generally was discussed by the Court of Appeals in its May 9, 1973 opinion from the stay order of this Court. PPG Industries, Inc. v. Continental Oil Company, 478 F.2d 674, 680 (5th Cir. 1973), the Court saying, as follows:

> In the context of federal actions attacking state criminal proceedings or the collection of federal taxes the Supreme Court has explicitly held that the factors governing the decision to grant or withhold an injunction or declaratory relief are largely the same, see Samuels v. Mackell, 1971, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688; Great Lakes Dredge & Dock Company v. Huffman, 1943, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407, and in our view it is logical that similar considerations should underlie the decision to grant either form of remedy

in a diversity action involving only private rights as well. As the Supreme Court observed in *Meredith* [Meredith v. Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9], a declaration of rights is normally a prerequisite to an award of injunctive relief, whether or not the plaintiff prays for a declaratory judgment. Likewise, a declaratory judgment, though not itself coercive, may serve as the basis for subsequent injunctive relief in an appropriate case. See 28 U.S.C.A. 2202. The close relationship of the two remedies, both of which are discretionary, logically and properly calls for consideration of similar factors in deciding whether either should be granted.

Moreover, this Court can consider substantially settled the general question of a right to an injunction subsequent to declaratory judgment. Again, the Court of Appeals has provided a definitive statement of the rule, PPG Industries, Inc. v. Continental Oil Company, *supra,* at page 679, the Court saying:

> * * * Both parties have repaired to the courts to settle their dispute and have alleged that in the relatively near future Conoco definitely will be unable or unwilling to perform fully its gas sale contract with PPG. This state of affairs tends to indicate that a sufficiently concrete case or controversy exists between the parties and that the threatened harm is sufficiently imminent and certain that the prayer for an injunction is not premature. See Pierce v. Society of the Sisters of the Holy Name of Jesus and Mary, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070. If Conoco's conduct in failing to supply the amounts of gas agreed upon constitutes a breach of contract—an issue which we, of course, do not decide—then an injunction might ultimately be a proper remedy. See Standard Oil Company v. Lopeno Gas Company, 5th Cir. 1957, 240 F.2d 504.

See also Louisiana Power & Light v. United Gas Pipe Line Co., 456 F.2d 326 (5th Cir. 1972), reversed on other grounds, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369.

Defendants' request for specific performance by mandatory injunction is granted. Plaintiffs all say they wish to *test* the contracts. Under this mandate, they will deliver the cotton in accordance with the contract. This delivery is in no way to prejudice their right to recover damages, should these contracts be declared invalid by higher courts or by this court on a possible remand.

### WHAT LAW GOVERNS?

Four of the contracts under consideration contain a stipulation that they are to be governed by the laws of Tennessee.

Federal courts apply the conflicts of law rule of the forum. Klaxon Company v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

Louisiana Civil Code Article 10 states:

"The form and effect of public and private written instruments are governed by the laws and usages of the places where they are passed or executed."

From this provision has developed the general rule that validity and construction of a contract is determined by the *lex loci contractus* and the remedy according to *lex fori*. Bologna Bros. v. Morrissey, 154 So.2d 455 (La.App. 2nd Cir. 1963).

Thus, when we consider the provisions in the contract it could be argued that Tennessee law should apply:

"If after investigation, it appears that the parties have indicated, either expressly or tacitly, that their rights and obligations should be governed by the laws of the place of performance then the court should not hesitate to apply the law to the case." McKane v. New Amsterdam Casualty Co., 199 So. 175, 182 (La.App.Orl.1940), *quoted in* Palmer v. Chamberlin, 191 F.2d 532, 536 (5th Cir. 1951).

However, in the "Law of Conflicts" there have been erosions and inroads into the rigid rule, exemplified in Article 10 of the Louisiana Civil Code. Numerous states have adopted the "most significant relationship" rule as set forth in Restatement (2nd), Conflicts of Law, section 332, in order to avoid *lex loci contractus*. As Judge Dawkins stated in Lester v. Aetna Life Ins. Co., 295 F.Supp. 1208, 1211 (W.D.La.1968):

"The new and more rational approach avoids mechanical application of the law of the place of the making or performance of a contract; rather it places emphasis upon the laws of the State having the most significant quantitative *or* qualitative contacts directly concerning the matter in dispute."

Louisiana has specifically adopted this new approach in only one case, C. I. T. Credit Corp. v. Hulett, 151 So.2d 705 (La.App. 3rd Cir. 1963). *See also* concurring opinions in Doty v. Central Mutual Insurance Co., 186 So.2d 238 (La. App. 3rd Cir. 1966), cert. denied 249 La. 486, 187 So.2d 451 (1966), and Blanchard v. Blanchard, 180 So.2d 564 (La. App. 3rd Cir. 1965). In the *Lester* decision we followed this new approach and stated:

"Of course, we realize that Louisiana's *lex loci contractus* rule is statutory (La.Civ.Code, art. 10) rather than jurisprudential. Thus Louisiana Courts are not free to discard the rule. But we feel that the Louisiana Supreme Court, in construing the statutory rule, would consider the appellate decisions by Judge Tate and the modern trend of emphasizing significant contacts. And we believe that where, as here, Louisiana contacts are so significant, Louisiana

courts would give a party the benefits of Louisiana law."

In these cases, all parties save and except one, agree that the Louisiana Law governs. In No. 19351, McFadden originally urged that Tennessee law should govern and that we should stay No. 19351 so that they could proceed in Tennessee. However, in a four-way telephonic conversation with attorneys for all parties, this court informed Mr. Davis, counsel for McFadden, that he could not "have his cake and eat it too." That is, if he proceeded in Tennessee, we would not hold the cotton under Louisiana sequestration. He elected to proceed in Louisiana.

■ The cotton is in Louisiana. The plaintiffs are residents of Louisiana. All counsel agree to be governed by Louisiana law.

## CROP PLEDGES

Plaintiffs argue that duly recorded crop pledges exist on the cotton produced by some of them. They insist that, because of the prior recorded crop pledges, the contracts are invalid and unenforceable. Louisiana Civil Code Article 2031 says:

"Every condition of a thing impossible, or *contra bonos mores* (repugnant to moral conduct) or prohibited by law, is null, and renders void the agreement which depends on it."

Louisiana Revised Statutes 9:4381:

"Sale of pledged crops; penalty

"No person who shall have pledged crops of agricultural products shall sell or otherwise dispose of the crops, or any part thereof with intent to deprive the pledgee of his pledge, unless the latter shall have written consent to such disposal of the said crops.

"Any person who violates this Section shall be fined not more than one thousand dollars, or imprisoned for not more than six months, or both."

and

Louisiana Revised Statutes 9:4382:

"Purchase of pledged crops; penalty

"No person shall wilfully and knowingly purchase, receive for sale or other purpose, or accept donation or delivery of any pledged crops of agricultural products with the intent to deprive the pledgee of his pledge unless the latter shall have given his written consent to such disposal of the said crops.

"Any person who violates this Section shall be fined not more than one thousand dollars, or imprisoned for not more than six months or both."

■ Louisiana Courts have not interpreted these laws so as to permit a promisor to invalidate his own contract because of his own contract pledge. Alexandria Credit Assn. v. Horn, 199 So. 430 (La.App.1940), held that pledgor, in disposing of the crop to a third party, committed a tort. He thus became personally liable to the pledgee for the amount due, not to exceed the value of the crops. The Court did *not* invalidate, but held that the purchaser, in dealing with the pledgor, "assumed the risk involved, and for all legal intents and purposes, became a joint tort feasor with [the pledgor] in disposing of the cotton." 199 So. at 433.

■ In Louisiana Farm Bureau C. G. Co-op Assn. v. Clark, 160 La. 294, 107 So. 115 (1926), the Louisiana Supreme Court *did* invalidate. Why? The entire crop was under a duly recorded crop pledge. The plaintiff-*buyer*, before making demand for the delivery of the cotton,

"made no offer whatever to Tallulah State Bank [the pledgee] to pay the amount of this recorded pledge, which affected, of course, the entire crop. The president of said bank was not willing for the defendant to deliver the cotton covered by the pledge to plaintiff * * * without the bank being paid in advance * * *. Had defendant attempted to ship this cotton to plaintiff * * * without the

written consent of the bank, his entire crop would have been seized, and, in addition to this, he would have been subjected to criminal prosecution under [R.S. 9:4381]." 107 So. at 121.

Thus, because the buyer refused to pay the pledgee before making a demand for delivery, the court refused to enforce the agreement against the seller. In the case at bar, there has been no "demand for the delivery of the cotton" by the purchasers-defendants. They have asked for specific enforcement and the presence of duly recorded crop pledges presents no bar to that enforcement. To assure that these pledges are satisfied, we will include in our formal judgment an order that any and all crop pledges must be paid "in advance," out of the purchase price.

## THE SEQUESTRATION

Plaintiffs' counsel insists that there has been an abuse of the judicial process surrounding the application and issuance of the sequestration orders. To quote from plaintiffs' brief:

To understand the background and to properly appreciate the abuse of the judicial process surrounding the application and issuance of these sequestration orders, it is necessary to be aware that Louisiana law affords three types of sequestrations, i. e., sequestration on the motion of a litigant who claims ownership, right to possession of property, or a mortgage, lien, or privilege on property—Article 3571; sequestration on the motion of a litigant who claims a lessor's privilege—Article 3572; and judicial sequestration on the Court's own motion —Article 3573. All of the articles are founded in the Louisiana Code of Civil Procedure.

Sequestration to enforce a lessor's privilege is not germane to these proceedings.

The primary difference between sequestration under Article 3571 and under 3573 is that Article 3574 requires that:

"An applicant for a writ of sequestration shall furnish security for an amount determined by the court to be sufficient to protect the defendant against any damage resulting from a wrongful issuance, unless security is dispensed with by law."

The defendants have, as the record will fully substantiate, refused to move for sequestration under Article 3571 whereby they would be required to post the security required by Article 3574. Neither have the defendants moved for an injunction which would require their posting security.

What the defendants have done is to seek judicial sequestration under Article 3573 by applying for it through the catalyst of Article 3571. This represents a distortion and abuse of the law, legal ethics, and the judicial process.

Judge Dawkins signed the original judicial sequestration order on October 30, 1973, which order, by its terms, sequestered the warehouse receipts. On October 31st this order was amended requiring the "class" to deliver to the Clerk all warehouse receipts and requiring defendants and other cotton merchants to post bond. On November 1, 1973, both the order of October 30th and October 31st were stayed, pending further instructions. The class action designation was also recalled on November 1, 1973. Hearings on various facets of the cases were held before Judge Dawkins on November 26, 27, and December 5th. At the conclusion of the December 5th hearing "it was ordered that all pending matters be taken under advisement." It was also on this date that the Judge reinstated the original judicial sequestration order of October 30th. Plaintiffs' filed a notice of appeal against the order of judicial sequestration. On December 10th the Court issued its judicial sequestration of the cotton of plaintiffs in the warehouse. The Fifth Circuit Court of Appeals declined to hear the matter but affirmatively de-

nied the request that Judge Dawkins' order be stayed.[7] This was the posture of the writs of judicial sequestration as of January 3rd. Subsequently a motion was filed to have the cotton released to them on bond. To grant this motion "at this point in time" would negate completely our prior holding granting to defendant-buyers the right to specific performance.

The Louisiana Supreme Court, in Davenport v. Sterling Lumber Company, 143 La. 671, 79 So. 215 (1918), in speaking of sequestration bonding, stated:

"A trial judge must of necessity, before he permits one of the parties to set aside a judicial sequestration on bond, believe that his action in so doing will not cause the other party irreparable injury, and the question of irreparable injury is addressed to his judicial discretion and must primarily be determined by him. Where property rights are involved, and it is necessary to maintain the status quo, a judicial sequestration is often the only safe manner of conserving the rights of the parties."

See also decision of the Louisiana Supreme Court in Eltringham v. Clarke, 49 La.Ann. 340, 21 So. 547 (1897), setting aside the District Court's order to bond out property under sequestration; and maintaining the sequestration, pointing out the obvious difference between bonding out a sequestration in a suit solely for a money judgment from the beginning. The Court said, quoting with approval from an earlier decision:

"*The sequestration improperly dissolved might forever deprive the plaintiff of the object of his suit.*"

■ Plaintiff-sellers argue that Article 3573 (judicial sequestration) of the Louisiana Code is violative of due process under Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556. In December (42 L.W. 3345) the Supreme

Court of the United States heard argument on whether or not judicial sequestration procedures, permitted by Louisiana law and strikingly similar to the replevin statutes struck down in *Fuentes*, were violative of due process. In this posture, we will not anticipate the Supreme Court of the United States. We agree and follow the Supreme Court of Louisiana's decision in the same case. (W. T. Grant Company v. Mitchell, 263 La. 627, 269 So.2d 186).

## LESION

Plaintiffs urge that the contracts are null and void on the basis of *lesion beyond moiety*. Applicable codal provisions are:

"Art. 1860. Lesion is the injury suffered by one who does not receive a full equivalent for what he gives in a commutative contract. The remedy given for this injury, is founded on its being the effect of implied error or imposition; for, in every commutative contract, equivalents are supposed to be given and received."

"Art. 1861. The law, however, will not release a person of full age, and who is under no incapacity, against the effect of his voluntary contracts, on account of such implied error or imposition, except in the two following cases:

"1. In partition where there is a difference in the value of the portions to more than the amount of one-fourth to the prejudice of one or [of] the parties;

"2. In sales of immovable property, the vendor may be relieved, if the price given is less than one-half of the value of the thing sold; but the sale can not be invalidated for lesion to the injury of the purchaser."

"Art. 1871. In all questions of lesion the value of that which was the subject of the contract at the time of

7. The U.S. Court of Appeals also denied, on November 19, 1973, plaintiffs' request of mandamus and prohibition having to do with plaintiffs' motion for judgment on the pleadings.

making it, is the rule by which the lesion is to be ascertained. Even in the case of minors, changes in value by subsequent events are not to affect the contract."

"Art. 2590. To ascertain whether there is a lesion beyond moiety, the immovable must be estimated according to the state in which it was, and the value which it had at the time of the sale, or at the time the option was granted if the sale be made pursuant to a valid contract of option."

"Art. 2594. Rescission for lesion beyond moiety is not granted against sales of movables and produce, nor when rights to a succession have been sold to a stranger, nor in matter of transfer of credits, nor against sales of immovable property made by virtue of any decree or process of a court of justice."

(Louisiana Civil Code)

■ Value, within codal article provisions, means market value at the time contract was entered into. Even in the case of minors, changes in value by subsequent events are not to affect the contract. (Civil Code Arts., supra; Pitre v. Pitre, La.App., 162 So.2d 430, writ issued, 246 La. 597, 165 So.2d 486, affirmed 247 La. 594, 172 So.2d 693. Then, too, it is clear that the parties intended an ultimate sale of picked cotton, a movable not subject to attack for lesion.

## WHO KEEPS THE COTTON WHILE · THE LITIGATION CONTINUES

■ It is assumed, these cases will be with the courts for some time. However, sellers, pursuant to a judgment which will be signed today, may deliver the cotton to the buyers, who will pay off the crop liens and hand over the balance to sellers. This delivery would be without prejudice to plaintiff-sellers' rights to pursue their desire for a judicial determination of the validity of their contracts through the appellate courts. Should they eventually prevail they will be able to recover damages.

That decision is with the sellers who can appeal suspensively our final order or deliver the cotton with full reservation of their rights to damages—if the agreements are eventually declared invalid.

Plaintiffs, by deposition, seem to be in accord with the affidavit of plaintiff Johnie Kovak, Jr., of October 25, 1973, to the effect that his present intention was to warehouse his cotton until a definitive judgment has been rendered.

If plaintiffs desire, they will be granted immediate suspensive appeals from the decisions of this court. They may deliver the cotton under the terms and conditions outlined and appeal, *or* they may decline to deliver and appeal. If they opt to take the latter course, the warehouse receipts and cotton will remain with the court, pending a final adjudication by the appellate courts. Both Judge Dawkins and the Court of Appeals have denied a stay of the judicial sequestration. We do, too.

■ We have given a great amount of thought to requiring the buyers to execute a bond for the difference in the amount specified in the contract and market value as of the cut-off date. We more or less initiated this thought by letters of January 18th and 21st (1974). On further study, we are convinced that this procedure would be appropriate and permissible only where a preliminary injunction was granted. We do not believe that a bond can be required where specific performance has been ordered in the form of a permanent injunction.

## THE BOLIN CASE, 19389

■ With regard to the Bolin agreement, Bolin Farms, a partnership, contends that Johnny Bolin was not authorized to sign in its behalf. Petitioners rely on the articles of partnership that have been submitted. Under the Articles, Melvin R. Bolin (father) is designated to have "the management and control" of the partnership, with authority to act as the agent of Johnny R. Bolin

and Melvin G. Bolin (brothers). This was in 1969.[8]

Article 2874 of the Louisiana Civil Code provides that if a debt is contracted by one of the partners who is not authorized, the partnership will nevertheless be bound "provided it be proved that the partnership was benefited by the transaction." The United States Supreme Court interpreted this codal provision in Beauregard v. Case, 91 U.S. 134, 140–141, 23 L.Ed. 263 (1878), wherein it was stated that:

"A debt contracted by one of the partners, even without authority from the others, binds them if it be proved that the partnership was benefited by the transaction."

The Court determined, as a test for "benefited," whether the money involved (money overdrawn from plaintiff bank in that case) was "applied to the purposes of the co-partnership." If so, the Court went on, "there can be no doubt of [the partner's] liability for the same jointly with his partners." Our contract was signed *by* Johnny Bolin *for* Bolin Farms. Bolin Farms was the contracting party and the purchase price will inure to the benefit of Bolin Farms. The contract was entered into by Johnny Bolin for the "purposes of the co-partnership."

 The Bolin partnership is bound for another reason. The Louisiana Supreme Court, in Gruner v. Stucken, 39 La.Ann. 1076, 3 So. 338 (1887), held that where the outside party has no notice of any special limitations on the authority of the partners, the partnership may be bound because:

"The authority for each transaction may be implied from the nature of the business, according to the usual and ordinary course in which it is carried on by those engaged in it * * *." 3 So. at 339.

The outside parties

. "had the right to assume that such transactions were within the scope of the partnership business, and within the presumed knowledge of all the co-partners." 3 So. at 340.

The evidence shows that Johnny Bolin was held out as a partner with the authority to conduct the ordinary business of the partnership:

(1) The business affairs and financial arrangements of the partnership were handled by Johnny Bolin and his father (Dep. of Johnny Bolin, p. 7).

(2) Johnny Bolin signs most of the checks for the partnership. (Dep. p. 7).

(3) Any of the three of the partners deal with merchants, buy the grain or other supplies needed for the operation of the farm. (Dep. p. 7).

(4) Johnny Bolin personally acquired the consent of the landlords to sell the cotton (Dep. p. 32).

(5) The ginner informed Johnny Bolin that the contracts to sell were available (Dep. p. 33).

(6) Johnny Bolin is the "most active partner"; he "pretty much run[s] the operation." (Dep. p. 38).

(7) The father, Melvin R. Bolin, booked the cotton in 1972, but that year was the first time that he had done so. (Dep. p. 45).

(8) Plaintiffs' attorney stated during the deposition:

"I have agreed that whatever your [Johny Bolin] testimony would be that that would be the testimony of your father to save him from coming * * *." (Dep. p. 52).

(9) Neither Johnny Bolin's father or brother know "anything different" from what Johnny Bolin testified to at his deposition. (Dep. p. 53).

As to his father and brother, the other members of the family partnership, Judge Dawkins pretty well and briefly cleared up the situation on his interrogation of Bolin:

"The Court: At the time you signed it they didn't kick about it, did they?

---

8. He (the father) has now had three heart attacks.

"The Witness: No, they didn't say anything about it." (Tr. 150).

The presently alleged objection of lack of authority was never reported to the buyer. Nor did father or brother take the stand to deny it. As Johnny Bolin next expressed it:

"They didn't object hard but they said they didn't think it was a good idea, but since I already signed it, it was done." (Tr. 152).

"The Court: "He admitted in answer to my question they went along with him. They objected but they went along with it * * * as long as they remained silent I think they are estopped as far as the buyer is concerned." (Tr. 152, 153).

Plaintiff, Bolin Farms, can hardly rise above the facts by intruding the articles of partnership in this record. By the articles the two sons vest managing authority in the father; but non-exclusive, and with no restriction of the vested ordinary partnership authority of each of them.

### THE ALLENBERG CASE, 1965[2]

█ The plaintiff here seeks a sharecropper class designation, together with injunctive relief, as a matter of law. Petitioner is a tenant farmer. On March 30th he contracted to sell and deliver "all and only the cotton produced on 163 acres of land." It is alleged that this cotton was contracted without the express or implied consent of the landowners on whose property the cotton was to be grown. The landowner's interest in the cotton is $\frac{1}{4}$th; the petitioner's interest is $\frac{3}{4}$ths. Thus, the sharecropper has contracted to sell all of the cotton produced, but he owns only $\frac{3}{4}$ths. He prays that the agreement be declared null and void and of no effect. He reasons that the cotton cannot be equitably divided in kind because of the "varying staple value and weight per bale."

In his memorandum, petitioner concludes that "[W]hen either the sharecropper or the landowner contract for share cotton without the consent of the other, the Louisiana Supreme Court has held that such contract is unenforceable." Upon careful analysis of Louisiana law, we reject this conclusion.

In La. Farm Bureau C. G. Coop. Assn. v. Clark, 160 La. 294, 107 So. 115 (1926), landlord defendant contracted to sell to plaintiff all cotton "owned, produced, controlled, or acquired by defendant" during 1924–27. In 1924, defendant leased his plantation to tenants on the share system for $\frac{1}{2}$ of the cotton produced. The Louisiana Supreme Court held that

"Products produced upon the land of the landlord under a share contract, belong, in the proportion agreed upon, to the landlord and the tenants. The marketing agreement in *this case cannot be enforced against the defendant as far as the sale and delivery to plaintiff * * * of the undivided three-fourths interest of defendant's tenants in the cotton * * *.*" 107 So. at 121 (emphasis added).

The Court relied upon the earlier opinion in Young v. Gay, 41 La.Ann. 758, 6 So. 608 (1899). There, plaintiff-tenant sued for sums due under the lease, alleging that he was forcibly ejected from the plantation. The landlord took possession of the entire crop. The Court held that the landlord must *account* to the tenant for his $\frac{1}{4}$th interest:

"The plaintiff owned his three-fourths interest in the crops less what he owed to plaintiff [defendant] for advances made and he had the undoubted right after paying for advances, to take it off and sell it, or sell it in the field." 6 So. at 610.

The Court then proceeded to divide the net proceeds of the crop and 587 bushels of corn left on the place, all on a $\frac{3}{4}$ths–$\frac{1}{4}$th basis.

The Clark decision was followed by La. Farm Bureau Cotton Growers Co-op. Assn. v. Bannister, 161 La. 957, 109 So. 776 (1926). Under the same factual situation found in *Clark,* the Louisiana Supreme Court held:

"We adhere to our holding in the Clark case that where the lessor leases

land to a tenant under a share contract, the crop produced belongs to the lessor and the lessee, respectively, in the proportions fixed by the contract between them.

"Necessarily it follows that the defendant cannot be compelled to deliver to plaintiff association cotton *of which he is not the sole owner,* as it is not legally possible to do so without the consent of his co-owners." 109 So. at 777.

Implicit in this holding is the fact that a tenant or landlord may sell the cotton *of which he is the sole owner* without the consent of his co-owner. "The owner of growing crops, be he landowner or another person, may sell, pledge or otherwise dispose of his interest."[9]

Another decision adhering to Clark-Bannister was La. Farm Bureau Cotton Growers Coop. Assn. v. Bacon, 164 La. 126, 113 So. 790 (1927). The Court in *Bacon* interpreted *Bannister* as holding that the landlord was not obligated to sell and deliver even *his* undivided part of the crop. However, *Bannister* did not so hold. *Bannister* merely followed *Clark* and held that the portion of the crop that the landlord did not own, he could not sell.

In a related vein, the Louisiana Supreme Court in In re Meaux Bros., 177 La. 997, 149 So. 886 (1933), stated that a privilegee in favor of furnishees of supplies to the tenants existed on that proportion of the crops owned by the tenants. The Court reasons from *Clark*:

"Under such [lease] contracts the shares of the landowner and of the cultivator belong absolutely and at all times to them respectively in the proportions fixed by the contract." 149 So. at 886.

Similarly, the Landreneaux v. Dergin, 19 La.App. 542, 134 So. 283 (1st Cir., 1931), a tenant pledged *all* the crops. The lease agreement provided that the tenant was owner of ⅔rds of the crop. The Court held that since the landowner was not a party to the pledge, "the pledge must be restricted to the two-thirds which the lessee and tenant had the right to pledge, and the one-third belonging to [the landowner] must be held to be not affected thereby, nor subject to any privilege claimed * * *." 134 So. at 285.

It is our appreciation of the Louisiana law that this contract is valid as to the tenant's ¾ths share of the cotton, and it is simply not applicable to the landowner's one-fourth.

The basic findings and conclusions set forth in the other contract cases are applicable here, but there was no definitive motion before us (on January 3, 1974) which would permit a final disposition. Plaintiff has prayed for the issuance of a preliminary injunction. This request for a preliminary injunction is and must be denied because we reject the contention that the agreement is null and void as to the ¾ths interest.

There is also a request for the designation of a class (all lessee farmers who contracted their cotton without the consent of their lessors). There is no showing of any large number of sellers in this category. The "class action" designation is denied. There has been no showing that "the class is so numerous that joinder of all members is impracticable." Rule 23(a)(1), F.R.Civ.P.

This case now pends on the complaint of Jones, and the answer and amended answer and counterclaim of Allenberg. We do not know who has possession of the Jones cotton. It has not been sequestered. The present posture of the case does not place it in a category for a definitive judgment on the merits. Perhaps later discovery, and consideration of subsequently filed motions will facilitate a final judgment.

Attached are formal judgments in each case.

---

9. Yannopoulos, Standing Crops, Movables or Immovables, 17 Loyola L.Rev. 323, 330 (1971), and cases cited therein.